**Denny L. HOOD, Harriet C. Hood,
Plaintiffs,**

v.

**Raymond L. McCONEMY, Jr., Defendant.**

**Denny L. HOOD, Harriet C. Hood,
Plaintiffs,**

v.

**Ernest S. WILSON, Jr., Defendant.**

**Civ. A. No. 3808.**

United States District Court,
D. Delaware.

Oct. 22, 1971.

C. Waggaman Berl, Jr., Booker, Leshem, Green, Shaffer, Berl & Wise, Wilmington, Del., for plaintiffs.

Andrew B. Kirkpatrick, Jr., and Walter L. Pepperman, II, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Raymond L. McConemy, Jr.

Victor F. Battaglia, Biggs & Battaglia, Wilmington, Del., for Ernest S. Wilson, Jr.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This case is presently before the Court on the motions of both defendants for summary judgment against the plaintiffs, Denny L. Hood and Harriet C. Hood ("Hoods"), and the motion of the defendant Ernest S. Wilson ("Wilson") for summary judgment on the cross-complaint of the defendant Raymond L. McConemy ("McConemy") for indemnification and contribution. The action is based upon alleged legal malpractice, and is predicated upon the defendants' joint representation of the plaintiffs in a prior medical malpractice suit.[1]

The Hoods are residents of Pennsylvania, and were plaintiffs in the earlier medical malpractice litigation. McConemy, a Pennsylvania attorney, and Wilson, a Delaware attorney, represented the Hoods in the prior suit. Separate suits were commenced by the Hoods against McConemy on June 13, 1969 and against Wilson on November 20, 1969. They were consolidated for all purposes in February of 1970.

The factual background pertinent to this action involves the preparation for and management of the initial medical malpractice suit. In 1963, the Hoods employed William P. Thorn ("Thorn"), a member of the Pennsylvania Bar, to represent them in an action based on alleged surgical negligence. Shortly thereafter, McConemy and Thorn became associated as partners and the Hoods' case was transferred to the partnership. Thorn and McConemy appeared on behalf of the Hoods before the Joint Screening Panel of the Delaware Medical Society and the Delaware Bar Association ("Joint Panel") on October 7, 1964, to present the plaintiffs' malpractice claim in accordance with the Joint Panel's procedures.[2] In mid-October, the Joint Panel notified the plaintiffs and their attorneys of its decision that there was no reasonable probability that the procedures followed in the allegedly negligent surgery constituted professional negligence.

On February 10, 1965, the day on which the statute of limitations was to run, McConemy associated with Wilson in the Hoods' case, and Wilson filed suit

---

1. The precise nature of the Hood-McConemy-Wilson employment agreement is disputed at this point, and will be of crucial import to this litigation. However, such factual disputes are not to be determined on summary judgment.

2. Several years ago, the Delaware Medical Society and the Delaware Bar Association adopted the "Joint Medico-Legal Plan for Screening Medical Malpractice Cases", which, as the name suggests, was designed to facilitate the prosecution of medical malpractice cases. In response to the filing of numerous unfounded suits subjecting doctors to adverse publicity, and the recognized problem of obtaining competent expert counsel to testify for aggrieved patients, the plan provides for a hearing before both legal and medical experts who make an evaluation of the claims. If there is a finding that there was a "reasonable possibility" of professional negligence the Panel will provide an expert witness to testify in the plaintiff's behalf; however, if the determination is adverse to the claimant, the claimant and his attorney are precluded from filing suit unless strong and overriding reasons compel such action. See generally Judge Christie's opinion in Civil Action No. 622, 1966; Delaware Superior Court.

in this Court seeking money damages on plaintiffs' medical malpractice claim. Wilson arranged for the sealing of the complaint and evidently had an understanding with McConemy that he would investigate plaintiffs' claim within thirty days to ascertain its merits and to determine whether there was sufficient reason to disregard the Joint Panel's findings.[3]

During the subsequent twelve months, Wilson and McConemy exchanged numerous letters concerning the availability of expert medical testimony to support the Hoods' claim. Wilson and his associate William T. Lynam III ("Lynam") made repeated efforts to obtain from McConemy the names of doctors allegedly available to testify on the plaintiffs' behalf and to arrange meetings with these experts to discuss the validity of the Hoods' complaint. The copies of this correspondence, (attached to Wilson's affidavit, docket item #30), evidence, for the most part, that the desired discussions did not materialize as a result of McConemy's failure to respond to Wilson's inquiries and the doctors' inability to attend the several meetings which were scheduled.[4] On several occasions during this exchange, Wilson and Lynam advised McConemy that the suit would be dismissed unless a conference with those providing expert testimony could be arranged,[5] and on February 16, 1966, Lynam notified McConemy that the District Clerk

of Court had indicated that the matter should either be dropped or proceed.[6]

On April 18, 1966, Wilson stipulated to an order of dismissal in the Hoods' action for medical malpractice. The Hoods alleged that they were not informed of this dismissal until Thorn contacted them in November of 1967 after making inquiries to Wilson regarding the status of the case (Hood affidavit, paragraphs 5–8, docket item #39 Exhibit A). After receiving repeated assurances from McConemy that the litigation was proceeding smoothly, the Hoods, on October 12, 1966 some six months after the dismissal, were informed by McConemy that their case would come to trial in November. (Affidavit of D. Hood, paragraphs 7–9). At this juncture, it is not clear from the record whether McConemy was notified by Wilson of the dismissal of the action in April of 1966 or learned of it from Thorn in November 1967. (Compare McConemy Affidavit, ¶ 4, docket item #27 with Wilson's Affidavit, Lynam's Memo, Exhibit A(N), docket item #30).

Efforts to reinstate the initial action pursuant to the provisions of Federal Rules of Civil Procedure 60(b) were unsuccessful, letter opinion of April 15, 1969 Del.Dist.Ct. C.A. No. 3808,[7] and the instant actions were commenced against Wilson and McConemy.

McConemy has moved for summary judgment against the Hoods on the statute of limitations defense. Wilson has moved for summary judgment against

---

3. See footnote 1.

4. On one occasion, Wilson had to cancel a scheduled meeting (Wilson letter to McConemy, June 11, 1965). However, on at least twelve occasions, Wilson's letters express either his desire for an immediate conference with the doctors and/or his concern regarding the cancellation of a scheduled discussion. (Wilson and Lynam's letters to McConemy of Feb. 16, 1965; March 3, 1965; March 30, 1965; May 5, 1965; June 11, 1965; October 4, 1965; Nov. 8, 1965; Nov. 19, 1965; Dec. 17, 1965; Jan. 14, 1966; Jan. 31, 1966; Feb. 16, 1966.)

5. Wilson and Lynam letters—May 5, 1965; Nov. 8, 1965; Jan. 14, 1966; Feb. 16, 1966.

6. Since nothing had been done on the case for over one year, it was subject to dismissal pursuant to Rule 12 of the Civil Rules of the United States District Court for the District of Delaware.

7. A renewed motion to reinstate was denied. Unreported Memorandum Opinion, February 7, 1971, Del.Dist.Ct. C.A. No. 3808.

the Hoods on the statute of limitations issue as well as two others: 1. that the claim is precluded on the basis of the Hoods' agreement concerning their submission of their claim to the Joint Panel, and 2, that Wilson was not negligent. He has also moved for summary judgment against McConemy on the issues of indemnification and contribution.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and * * * the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The movant bears the burden of producing the requisite undisputed evidence to entitle him to summary judgment, and the party opposing the motion is entitled to all favorable inferences which can be drawn from the evidence. See Cram v. Sun Insurance Office, Ltd., 375 F.2d 670 (4th Cir. 1967), 6 Moore Federal Practice ¶ 56.15[3] (2nd ed. 1966). Disputed factual issues cannot be decided on summary judgment. Toebelman v. Missouri-Kansas Pipe Line Co., 130 F.2d 1016 (3rd Cir. 1942).

Wilson's motion seeking summary judgment that he was not negligent as a matter of law must be denied. Ordinarily, issues of negligence are not susceptible to summary judgment and must be decided at trial. 6 Moore, Federal Practice ¶ 56.17 [42]. Rogers v. Peabody Coal Co., 342 F.2d 749 (6th Cir. 1965). Apparently, however, Wilson contends that since he had only agreed to take the Hoods' case contingent on his subsequent personal evaluation of the validity of the claim and that McConemy's actions prevented such a determination, he was not negligent. Assuming that this was the extent of his obligation,[8] Wilson did not make a determination that the malpractice claim was unfounded before dismissing the complaint. Whether his efforts to obtain the information and interviews with prospective medical witnesses necessary to ascertain the merits of the Hoods' claim were sufficient to exonerate him from any charge of professional malfeasance is a factual matter for the jury. Further, McConemy's allegation that Wilson dismissed the initial suit without notification of McConemy raises an issue of fact which, if proven, could sustain a finding of negligence. Finally, after a continuous absence of cooperation from McConemy, Wilson might have been expected to inform or confer with the Hoods regarding the status of the lawsuit. None of these prospective conclusions is, as yet, precluded; and therefore, the Court cannot find as a matter of law that Wilson was not negligent.

Involving disputed factual questions, the Wilson motion for summary judgment against McConemy on the issues of indemnification and contribution must, also, be denied. In Delaware, the question of indemnification involves the determination that both parties are negligent and that one party's wrongful conduct or negligence is greater than that of the other party. See Lutz v. Boas, 40 Del.Ch. 130, 176 A.2d 853, 856 (1961). While it presently appears that Wilson made frequent efforts to prosecute the Hoods' claim and stipulated to the dismissal only after repeated unheeded warnings to McConemy, a jury might find that his failure to notify McConemy of the dismissal, or the failure to directly notify the Hoods of McConemy's procrastination and the problems it was causing constitutes greater negligence than that of McConemy. It would be a usurpation of the jury's function for the Court to undertake a quantitative evaluation of any negligence on the part of the two defendants. This issue is particularly ill-suited for a decision on summary judgment since it involves several factual determinations of the existence and degree of negligence which would be jury questions at trial.

**8.** See footnote 1.

■ The issue of contribution is contingent on a determination of whether both Wilson and McConemy share a common liability to the plaintiffs arising out of a single injury, and are, therefore, joint tortfeasors. Fields v. Synthetic Ropes, Inc., 215 A.2d 427 (Del.Sup.Ct. 1965) and Mumford v. Robinson, 231 A. 2d 477 (Del.Sup.Ct.1967), see also 10 Del. C. §§ 6301 and 6302. Wilson suggests that his negligence, if any, was in dismissing the lawsuit; while McConemy's negligence was in the alleged delay and mishandling which resulted in the dismissal. These allegedly constitute separate wrongs, and the two defendants are, therefore, not joint tortfeasors. The Court cannot accept this characterization of the Hoods' suit. This action seeks damages for the negligent handling and dismissal of the Hoods' medical malpractice suit, a single injury. The present record does not preclude a finding that the negligence of both attorneys was the proximate cause of the Hoods' damages. The issue must be determined by the jury on a trial of the entire case.

Wilson argues that as a matter of law and absent allegations of fraud the Hoods are barred from pursuing their claim against him by virtue of their agreement with the Joint Panel. Citing various provisions of the agreement signed by the Hoods and McConemy prior to submitting their claim to the Joint Panel, Wilson contends that he was required to make an independent evaluation of the validity of the Hoods' claim and that he was empowered to dismiss or prosecute the action on his own determination. Further, he alleges that his understanding with McConemy prior to associating on the case gave him the authority to make the determination regarding the merits and to dispose of the action in a fashion which he thought appropriate.

■ Pursuant to the submission of their case to the Joint Panel, McConemy and Mrs. Hood signed statements expressing a knowledge of and an acquiescence in the requirements and practices of the Joint Panel. Under its rules, "no medical malpractice suit may be filed after an adverse determination by the Joint Panel unless the attorney bringing the matter for review * * * (is) personally satisfied that strong and overriding reasons compel such action to be taken * * *." (Joint Panel Agreement). This stipulation, Wilson claims, made it incumbent on him to determine the merit of the Hood claim and to dismiss the suit. To substantiate his position that he was under various legal obligations to handle the case in the fashion he did, Wilson, also, presents several letters to and from members of the Delaware Bar and opposing counsel involved in the initial suit discussing any alleged breach of the Joint Panel's by-laws. Finally, he cites the unreported opinion of Judge Christie in Del.Super.Ct. C.A. #622, 1966 to show that the agreements entered into by McConemy and the Hoods with the Joint Panel were binding contracts which gave him plenary authority over the handling of the malpractice suit. While the Christie opinion does discuss the Joint Panel agreements and does indicate the agreements constitute binding contracts between the doctor and the attorney-client, it does not support Wilson's interpretation that the attorney is given virtual unilateral control over the decision to initiate a suit in spite of an adverse finding of the Joint Panel and a similar authority over the prosecution of any suit so filed. The Christie suit involved a doctor's motion for summary judgment in a suit filed by a dissatisfied complainant after an adverse Joint Panel finding. Holding that the agreement constituted a binding contract to adhere to Joint Panel regulations, Judge Christie, nonetheless, pointed out that in certain instances the attorney and his client might decide to commence a malpractice suit. He stated:

In summary the Court rules that:

3. The claimant and his attorney have the exclusive right to personally

decide for themselves whether or not strong and overriding reasons exist which compel them to go forward with the claim. (P. 8)

Wilson seeks to have this Court do what Judge Christie expressly refused to do, and to construe the Hoods submission of their claim to the Joint Panel as an effective waiver of any authority they might have over the maintenance of their claim. The opinions of the several distinguished members of the Delaware Bar regarding the nature of Wilson's commitment to the Joint Panel are undoubtedly accurate;[9] however, this Court faces the question of Wilson's obligations to his clients, the Hoods. These responsibilities are governed, of course, not by his general undertaking as an attorney, but rather by his precise employment contract with the Hoods. Therefore, the Court concludes the pertinent contract is the Hood-McConemy-Wilson agreement and any authorization for Wilson's stipulation to the dismissal absent notice to McConemy or the Hoods must be contained therein.

■ The interpretation to be ascribed to the Wilson employment contract will determine the efficacy of this defense. The precise nature of Wilson's undertaking is disputed. It is apparent that Wilson agreed to make a determination of the validity of the Hood claim. Assuming for purposes of this motion that this was all he agreed to do, Wilson had made no such determination prior to the dismissal of the first action at a time when the statute of limitations barred bringing a second suit. Whether McConemy's lack of cooperation will ex-

cuse his non-performance is a question which is inappropriate for decision on summary judgment. Further, even under this limited commitment, Wilson's failure to notify McConemy or the Hoods of his actions could constitute professional negligence and a violation of his employment obligations.

The final issues presently before the Court are the motions of both defendants for summary judgment on the statute of limitations defense. Although there are certain factual distinctions between the two positions, they will be discussed together with appropriate references to the distinguishing features.

The statute of limitations defense raises three issues: first, what statute of limitations is appropriate; second, when did the statute of limitation begin to run; and third, did any action or omission of the defendants serve to toll the running of the statute.

■ Since Wilson was employed to provide services in Delaware, and did perform most of his services therein, the action vis-a-vis Wilson is governed by the Delaware law and statute of limitations. Pauley Petroleum, Inc. v. Continental Oil Co., 231 A.2d 450 (Del.Ch. Ct.1967); Friday v. Smoot, 211 A.2d 594 (Del.Sup.Ct.1965). This is the rule whether the action is one of contract, as in *Pauley*, or tort, as in *Friday*.

■ McConemy was hired in Pennsylvania to prosecute a medical malpractice action against a Delaware physician. While much of his performance took place in Delaware, certainly some of his alleged negligent handling of

---

9. It should be noted that the precise language of the Joint Panel requirements supports the position that a conclusion by McConemy, the attorney who presented the claim to the Joint Panel, that convincing reasons warrant bringing the suit will justify initiating a medical malpractice suit in spite of an adverse finding by the Joint Panel.

The February 15, 1965 letter of District Judge Caleb R. Layton, 3rd regarding the

problems with out of state counsel at Joint Panel hearings permits such an interpretation. In his February 12, 1965 letter to Rodney Layton, Wilson appears to accept this interpretation of the Joint Panel requirements. Under this construction, the prerequisite to bringing the Hoods' medical malpractice suit after the Joint Panel's decision had been fulfilled.

the case occurred in Pennsylvania. The malpractice action was, of course, always filed in and subsequently dismissed by a Delaware court. These circumstances give rise to the possibility of complex conflict of law problems.[10] However, the Court need not, at this juncture, determine what substantive law is applicable to the McConemy suit since in this instance, the statute of limitations is the same whichever law is involved. In a civil action in which jurisdiction is predicated on diversity of citizenship, a federal court will apply the conflict of law rules of the forum state. Klaxon Co. v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Delaware conflicts of laws incorporates the following statute:

Where a cause of action arises outside of this State, an action can not be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose * * *. 10 Del.C. § 8120.

Regardless of the nature of the plaintiffs' action, the appropriate Delaware statute of limitations is the same as or shorter than its Pennsylvania counterpart.[11] Therefore, the Delaware statute of limitations will govern both the Wilson and the McConemy cases. See Gaffney v. Unit Crane and Shovel Corp., 10 Terry 381, 117 A.2d 237, 238 (1955), and Natale v. Upjohn Company, 356 F.2d 590, 592 (3rd Cir. 1966).

█ The next problem concerns which Delaware statute of limitations is applicable to these actions. There are conflicts between various jurisdictions regarding whether legal negligence constitutes a breach of a contract implying a warranty of professional competence or a tort claim involving injury to personal property,[12] and Delaware courts have not resolved the issue. The defendants have attempted to characterize the action as one in tort for injury to personal property.[13] Such actions, they continue, are governed by 10 Del.C. § 8106A which imposes a two year limitation. The Court cannot accept this position and concludes that even if the Hoods' action is one in

---

10. Under Delaware conflict of law rules, an action based on contract is determined under the law of the place where it is made. Pauley, supra; Wilmington Trust Co. v. Pennsylvania Co., 40 Del.Ch. 1, 172 A.2d 63 (1961); Harris v. New York Life Insurance Co., 27 Del.Ch. 170 33 A.2d 154 (1943). Thus, if the Hoods action is one for contract, Pennsylvania law governs. In tort cases, the Delaware rule is that the law of the place of the tort determines the substantive rights of the parties. Friday, supra; Folk v. York-Shipley, Inc., 239 A.2d 236 (Del. Sup.Ct.1968). It is not clear whether the "place of the tort" is where the dismissal occurred, Delaware, or where the negligent omissions occurred, Pennsylvania.

11. If the plaintiffs' action is for: 1. personal injuries the Delaware Statute 10 Del.C. § 8118 provides two (2) years and the Pennsylvania Statute 12 P.S. § 34 provides two (2) years; 2. property injuries—with force 10 Del. § 8106A—two

(2) years and without force 10 Del. § 8106—three (3) years and 12 P.S. § 31—six (6) years; 3. contract or general tort—10 Del. § 8106—three (3) years and 12 P.S. § 31—six (6) years.

12. See generally 7 Am.Jur.2d, Attorneys at Law, § 185 and 49 A.L.R.2d 1212, 1218 §§ 3–4 and cases cited therein.

13. McConemy has argued that a suit for legal malpractice is for recovery for personal injuries, Bland v. Smith, 197 Tenn. 683, 277 S.W.2d 377, and therefore 10 Del.C. § 8118—a two year statute—is applicable. *Bland* involved a suit against an attorney in which the plaintiff alleged that the mishandling of his divorce case caused him to suffer physical injuries, i. e., mental anguish, etc. In this case, the personal injuries are relevant only to the merits of the Hoods' initial claim. Their claim against McConemy relates to damages he may have committed to their malpractice action, personal property.

tort, the applicable statute is 10 Del.C. § 8106 which reads in pertinent part:

> * * * no action based on a promise, * * * and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of action * * *. 10 Del.C. § 8106.

Prior to the enactment of 10 Del.C. § 8106A, the above quoted statute governed all suits for legal malpractice. In 1960, the legislature amended 10 Del. § 8118, the personal injury statute by extending the limitations period from one to two years. 52 Del.Laws, Ch. 393 § 2 eff. July 9, 1960. At the same time, 10 Del.C. § 8106A was incorporated to limit the bringing of actions " * * * for wrongful death or for injury to personal property * * * " to two years, 52 Del.Laws, Ch. 339 § 1 eff. July 9, 1960. 10 Del.C. § 8106 dealing with the recovery of damages for injuries unaccompanied by force or resulting indirectly from the act of the defendant remained unaltered.[14] Thus, the Court concludes that Section 8106A is limited to injuries accompanied by force, e. g. automobile negligence, etc. This construction comports with the Court's comprehension of the legislative intent behind the 1960 amendment to § 8118 and enactment of § 8106A. Therefore, whether legal malpractice is a contract action or tort action, § 8106 and its three year limitations period applies against both attorneys.

■ The efficacy of any statute of limitation defense necessarily depends upon the date on which the cause of action accrued. Each defendant maintains that any malpractice against him arose at the latest on April 18, 1966, the date of the dismissal of the Hoods initial action. Since neither suit was commenced within three years of the dismissal, both defendants argue these suits are barred thereunder. The Hoods counter with several arguments to substantiate the contention that their cause of action did not accrue until November of 1967 when they were notified of the dismissal. Citing F.R.C.P. Rule 60(b)'s provision for petitions for the reinstatement of dismissed actions, they claim that so long as the case could have been redocketed, their cause of action did not accrue.[15] The Court cannot accept this argument. When the initial action was dismissed and they were barred by the statute of limitations from reinstituting it, the Hoods could have initiated actions against both attorneys since the alleged negligent acts or breaches had occurred and the resulting damages had been sustained. The fact that they might subsequently successfully petition the Court for reinstatement of the initial action does not alter the fact that the alleged negligence and resulting injury were consummated; the parties were ascertainable, and the damages were calculable. If the Hoods' position were correct, as long as a court would entertain a petition to reinstate, the statute of limitations would not run. Rule 60(b) has no relationship to the accrual of a cause of action for legal malpractice and was not designed to emasculate the statute of limitations for such cases.

■ The plaintiffs raise two further arguments to support the contention that the statute of limitations did not commence to run until they were notified of the dismissal of the original action. First, they allege both attorneys had

---

14. Section 8106 was amended in 1970 to include reference to the newly enacted § 8126; however, the language concerning injuries unaccompanied by force remained intact.

15. In the alternative, the plaintiffs argue that at least during the one year period provided for petitions to reopen for "(1) mistake, inadvertence, surprise, or excusable neglect" Rule 60(b) (1), the statute of limitations did not run. This contention, also, fails for the reasons stated in the text.

continuing obligations to inform them of the dismissal, obligations not satisfied until November 1967. Second, they cite the doctrine that the statute does not begin to run until the discovery of the injury, i. e., their being informed of the dismissal of the first suit. Neither position is appropriate here.

The overwhelming majority of cases dealing with attorney malpractice and professional negligence refute the first contention. See generally 18 A.L.R.3rd 978 "Limitations—Attorney Malpractice" §§ 3, 5 & 8. Discussing the specific fact situation involved herein, the annotation states:

> In those cases where the negligence complained of is delay or inaction, which unlike a positive negligent act where the time of commission may with some certainty be established, covers some space of time, some courts have stated that the statute of limitations against a cause of action for negligent malpractice starts to run when the attorney's delay or inaction has resulted in some injury * * *, and thus, for example, if the delay results in a client's cause of action against another being barred by the statute of limitations, * * * and thus, at this time the statute of limitations against the client's cause of action will start to run. 18 A.L.R.3rd at 987.

See also 18 A.L.R.3rd at 1003 citing Shelly v. Hansen, 244 Cal.App.2d 210, 53 Cal.Rptr. 20 (1966); Galloway v. Hood, 69 Ohio App. 278, 43 N.E.2d 631 (Ct. App.Lucas Co. 1941).

■ The Delaware rule is in accord that the statute of limitations begins to run in a contract action when the breach occurs and in a tort claim when the injury to plaintiff occurs. Nardo v. Guido De Ascanis & Sons, Inc., 254 A.2d 254, 256 (Del.Super.Ct.1969). Clearly, the alleged injury or breach culminated in the dismissal of the first suit when it could not be brought again because the statute of limitations had run.

■ The second contention, that the cause of action does not accrue until the plaintiffs were aware of it, is without merit in these circumstances. Numerous Delaware cases have rejected this "time of discovery" rule and have held that, absent other factors, the plaintiffs' ignorance of a cause of action does not affect the date on which the action accrues, Mastellone v. Argo Oil Corp., 7 Terry 102, 82 A.2d 379 (Del.Sup.Ct.1951); Klein v. Lionel Corp., 130 F.Supp. 725 (D.Del.1955); Leibowitz v. Hicks, 42 Del.Ch. 209, 207 A.2d 371 (1965). The only case in which the doctrine was accepted was Layton v. Allen, 246 A.2d 794 (Del.Sup. Ct.1968). That case involved a suit for medical malpractice where the plaintiff felt no discomfort until seven years after the initial operation. Subsequent examination revealed that a hemostat had not been removed during the initial operation. The court concluded that the limitations period did not commence to run until the plaintiff's injury manifested itself. However, the court clearly delineated the factors relevant to its conclusion by citing the "inherently unknowable" aspect of the internal injury situation. In light of the Delaware Supreme Court's specific and narrowly defined application of the "time of discovery" doctrine in *Layton*, this Court cannot accept plaintiffs' argument that the statute of limitations does not accrue until their discovery of the dismissal of the first action. A dismissal of a lawsuit, unlike a faulty operation, was ascertainable on and after April 18, 1966. Accepting plaintiffs' contention would produce a substantial alteration of Delaware's substantive law. For the above reasons, the Court concludes that the Hoods' cause of action against McConemy and Wilson accrued on April 18, 1966 for purposes of the running of the statute of limitations.

■ Absent some tolling of the running of the limitation period, the plaintiffs' present actions would be bar-

red since brought more than three years after the April 18, 1966 dismissal. The Hoods have alleged that the statute of limitations was tolled by the defendants' failure to notify them of the dismissal and subsequent assurances regarding the status of the initial litigation.[16] Delaware courts have stated that the statute of limitations may be tolled by the defendant's fraudulent concealment of a cause of action. See Giordano v. Czerwinski, 216 A.2d 874 (Del.Sup.Ct.1966); Layton supra; and Church of Religious Science v. Fox, 266 A.2d 881, 885 (Del. Sup.Ct.1970). The statute is tolled only until the plaintiff becomes aware of the facts being concealed. *Church of Religious Science*, supra, and *Giordano*, supra. The Hoods allege that they were apprised of the dismissal in late November 1967, although their attorney, Thorn, was evidently informed of it by Lynam on October 6, 1967. Since both suits were brought within three years of either date, the Court need not decide whether notice to Thorn would be notice to the Hoods.

The plaintiffs claim Wilson's failure to inform them that the action was dismissed and McConemy's repeated assurances that the action was progressing properly constitute concealment sufficient to toll the statute of limitations. Alleging that he had notified McConemy of the dismissal, Wilson argues that he had been hired by McConemy and notice to McConemy was notice to the Hoods. Since McConemy has denied any notice of the dismissal, this argument cannot be accepted on summary judgment.[17] Further, the question of whether the several threats regarding dismissing the action constituted actual notice ·to McConemy must be decided at trial.

McConemy argues that one of the requisites of fraudulent concealment is scienter, i. e., an awareness of the dismissal, and since he was not apprised of the dismissal until November 1967, he could not conceal it from the Hoods. The Delaware cases, especially the *Layton* case, appear to require that the defendant have "actual knowledge of the wrong done or acted affirmatively in concealing the facts from the [plaintiff]. Such scienter and affirmative action are generally deemed to be essential elements for * * * fraudulent concealment", 246 A.2d at 798, see also *Nardo*, supra, 254 A.2d at 256. The scienter requirement, however, does not preclude a finding that McConemy fraudulently concealed his alleged negligence from the Hoods. The Lynam memorandum suggests that McConemy was aware of the dismissal, thereby raising a factual issue. Certainly, the numerous letters from Wilson threatening to dismiss the action might be found to constitute constructive notice. Finally, McConemy's alleged negligence consisted of the practice of procrastination and delay which was consummated by the April 18, 1966 dismissal. He had knowledge of the manner in which he was handling the lawsuit and Wilson's dissatisfaction therewith. This is sufficient knowledge to satisfy the scienter requirement.

The doctrine of fraudulent concealment, often, presumes some affirmative act by the defendant designed to prevent the discovery of the wrong. See *Layton* and *Nardo*; see generally 80

---

16. It should be noted that cases involving the accrual of a cause of action and the tolling of the running of the statute of limitations often fail to delineate these different concepts. The Court feels that the "date of discovery" rule (*Layton* case) and the theory of fraud or concealment tolling the running of the statute constitute two substantially different legal concepts. Many of the plaintiffs' arguments and authorities are appropriate in support of the latter doctrine, although they were unpersuasive regarding the former.

17. The validity of the claim that notice to McConemy was notice to the Hoods remains contingent on the exact nature of the employment relationship, a matter already postponed until trial. See footnote 1.

A.L.R.2d 368, 406–408; 51 Am.Jur.2d 719 Limitations of Action § 148. McConemy's repeated assurances regarding the status of the case are such acts. However, apparently Wilson's "concealment" consisted solely of nonfeasance, the failure to inform his clients. Although no Delaware cases have faced the issue, numerous state courts do not require an affirmative act where the wrongdoer maintains a fiduciary relationship to the plaintiff. See Watts v. Mulliken's Estate, 95 Vt. 335, 115 A. 150 (1921); Connelly v. Bartlett, 286 Mass. 311, 190 N.E. 799 (1934); and Higbee v. Walsh, 229 Iowa 408, 294 N.W. 597 (1940). See generally 173 A.L.R. 578, 588 Limitations —Effect of Concealment § 13. The courts reason that in a confidential and fiduciary situation, a relationship of trust is developed which imposes a greater duty to disclose information upon the individual in the fiduciary capacity. In Layton, the Delaware Supreme Court did not foreclose the applicability of the concealment doctrine to the situation where the wrongdoer did not act affirmatively to conceal the injury or cause of action.[18] Since the attorney-client relationship is fiduciary and an attorney is generally held to the strictest standard of fidelity and good faith, see generally 7 Am.Jur. 2d, Attorneys at Law § 93, the Court is of the opinion that Wilson's alleged failure to notify the Hoods or McConemy could be sufficient to constitute a fraudulent concealment.

Having concluded that the doctrine of fraudulent concealment might be applicable to toll the running of the statute of limitations until well within the three year period, the Court must deny summary judgment on the statute of limitations defenses.

The defendants have failed to sustain the difficult burden on summary judgment. Therefore, for the above reasons, the defendants' respective motions for summary judgment are denied.

Submit order in accordance herewith.

18. In *Layton*, the defendant doctor was not aware of the presence of the hemostat which caused the plaintiff's subsequent pain. The court refused to infer a concealment when the defendant lacked any scienter. The lack of knowledge, and therefore, ill-intent was central to the Court's reluctance to extend the concealment doctrine. These factors are not present here, since Wilson knew of the dismissal.