**STUDIENGESELLSCHAFT KOHLE, mbH as Trustee for the Max–Planck–Institut Fur Kohlenforschung, Plaintiff,**

v.

**HERCULES, INC., Himont U.S.A., Inc., Himont, Inc., Defendants.**

Civ. A. No. 86–566–JJF.

United States District Court,
D. Delaware.

Oct. 22, 1990.

Howard M. Handelman, of Bayard Handelman & Murdoch, Wilmington, Del. Arnold Sprung, and Nathaniel D. Kramer, of Sprung Horn Kramer & Woods, Tarrytown, N.Y., for plaintiff.

Charles S. Crompton, Jr., and William J. Marsden, Jr., of Potter Anderson & Corroon, Wilmington, Del. Francis T. Carr, Kenneth E. Madsen, James Galbraith, and Richard M. Rosati, of Kenyon & Kenyon, New York City, for defendants.

## MEMORANDUM OPINION

FARNAN, District Judge.

Plaintiff, Studiengesellschaft Kohle, mbH (hereinafter "SGK") brought this action against Hercules, Inc., Himont U.S.A., Inc., and Himont Incorporated (hereinafter "Hercules, et al.") for patent infringement and breach of contract. Defendants, Hercules, et al. counterclaim that SGK has breached an existing license agreement and violated the antitrust laws by enforcing, in bad faith, an invalid patent. Before the court now is defendants' motion for partial summary judgment alleging that Plaintiffs breach of contract claim is barred by the statute of limitations. Briefing having been completed this court will grant in part and deny in part the motion for partial summary judgment for the reasons stated below.

## I. FACTUAL BACKGROUND

SGK, Karl Ziegler (SGK's predecessor in interest) and Hercules, et al. have long running business dealings which first must be briefly outlined.

Karl Ziegler patented a process for making high molecular weight polymer through a process of joining together alpha-olefins. In addition, copolymerization was possible whereby different alpha-olefins were combined into a large, long chain molecule.

Hercules and Ziegler entered into a nonexclusive license agreement on September 24, 1954 giving Hercules rights to Ziegler's current patent applications and any patents issued thereon (hereinafter "Polyolefin Contract"). In return, Ziegler was entitled to royalties, which varied according to molecular weight, for all polymeric materials produced by Hercules under Ziegler's patents.

The Polyolefin Contract required Hercules to make payment of any royalties to Ziegler within thirty days after the close of each calendar quarter. As well, Hercules was required to keep books of account containing complete records of all data neces-

sary for the computation of royalties payable under the agreement. When payment was due, Hercules was required to provide a written statement showing all relevant computations regarding the royalty payments and if no payment was due then notice of such was to be given. Ziegler also retained the right to question any statement within six months after receipt. This right included an inspection of the books to the degree necessary to allow an independent accountant to verify or determine royalties paid or payable.

On December 12, 1962 the Polyolefin Contract was modified by the parties. Pursuant to this modification Hercules paid a one time lump sum royalty to satisfy any continuing obligation to pay royalties on polyethylene polymers produced or sold. To the extent that the express provisions of this modification did not alter the Polyolefin Contract, it remained in force.

On May 25, 1964 the Polyolefin Contract was again amended. This 1964 Amendment altered the royalty rate to be paid by Hercules for sales of Propylene Polymers (a term, like many others, that was carefully defined in the document). Again, a savings clause existed which provided that the original Polyolefin Contract would remain in effect except to the extent it was modified by the amendment.

A dispute arose between the parties in 1972 and in resolution thereof the parties negotiated another agreement on April 26, 1972. Hercules was granted a fully paid-up license under Ziegler's United States patent rights to manufacture up to six hundred million pounds of polypropylene per year. On sales that exceeded that amount Hercules was still obligated to pay royalties. This license was to run until December 3, 1980 at which time Ziegler's patents would expire. For patents that expired beyond December 3, 1980 Ziegler was obligated to license to Hercules, at their request, on terms no worse than the most favored other paying licensee. As with the other modifications, this agreement provided that it did not alter any provisions of the original Polyolefin Contract unless expressly stated.

From 1972 to 1975 no accounting was done by Hercules for the benefit of SGK.[1] It has not been asserted by any party that an accounting was necessary and therefore the Court will assume, for purposes of this motion, that the use or sale of polypropylene did not exceed six hundred million pounds during those years. Following a request on October 5, 1978 Hercules did provide an accounting to SGK for 1976 and 1977. Accountings then were provided for 1978 through 1980 by Hercules on a yearly basis.

On July 25, 1983 SGK inquired as to why no royalty payment was made for 1980 after seeing a publication of some industry-wide production figures. SGK believed that Hercules produced 890 million pounds of polypropylene during that year if the published figures were accurate.

In response to this inquiry, on September 30, 1983 Hercules informed SGK that they had used or sold 747 million pounds of polypropylene but less than 600 million pounds met the definition that required royalties to be paid. Hercules contends that the 1964 and 1972 amendments govern the definition of a polypropylene copolymer and thus limit those copolymers for which a royalty must be paid. On the other hand, SGK argues that all copolymers are governed by either the amendments or the original Polyolefin Contract.

On October 18, 1983 SGK wrote Hercules asking for a further explanation as to the exclusions of some copolymers from the royalty payments. In this communication SGK indicated they were surprised to find out, for the first time, that Hercules produced copolymers that did not fit the express definition of the 1964 Amendment. Again, they asserted their right to royalties under either the 1972 Amendment or the original Polyolefin Contract. Following a phone conversation SGK sent Hercules an offer to forbear from suit regarding this issue in return for Hercules agreeing to waive any statute of limitations defense it

1. Karl Ziegler died in 1973, thereafter all rights and obligations passed to SGK.

might assert so as to provide Hercules with sufficient time to look into the matter.

On December 1, 1983 Hercules wrote back altering the wording of the waiver of the statute of limitations to more accurately reflect their position. This new offer was then accepted by SGK through its representative on December 2, 1983. The amended waiver stated in pertinent part:

> If S.G.K. will forbear until May 21, 1984 from suit for past-due royalties, if any, under the Hercules/Ziegler agreements, Hercules will waive the defense of statute of limitations to such claim, except to the extent of any statute of limitations bar that already has fallen into place up to December 1, 1983.

On April 19, 1984, following a review of their files, Hercules informed SGK they believed they had fulfilled their royalty obligations pursuant to the Polyolefin Contract and its amendments. In December 1986 SGK filed the instant complaint that contains one of the claims that is the subject matter of this summary judgment motion.

Two issues are relevant for the disposition of the present application: (1) when did the cause of action for each yearly accounting accrue and (2) what was the effect of the waiver of the statute of limitations by Hercules.

## II. SUMMARY JUDGMENT MOTION

### A. *Summary Judgment Standard.*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). If there is no genuine issue as to any material fact then the moving party is entitled to judgment as a matter of law. *Id.* An issue is "genuine" only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Substantive law identifies which facts are "material" and only disputes over facts that "might affect the outcome of the suit under the governing law" will defeat summary judgment. *Id.*

The moving party need not affirmatively refute the elements; rather, they need only show the insufficiency of proof of those elements. *Houser v. Fox Theatres Management Corp.,* 845 F.2d 1225 (3d Cir. 1988). When the moving party has discharged their burden, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

Any doubts that exist as to the existence of genuine issues of material facts are to be resolved against the movant. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 900 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Moreover, all inferences are to be viewed in light most favorable to the non-movant. *Id.*

The judge's function on summary judgment is merely to determine whether a genuine issue of fact for trial exists or whether the evidence is so one-sided that one party should prevail as a matter of law. *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. The judge should not weigh evidence or determine the truth of any matters in dispute. *Id.* at 252, 106 S.Ct. at 2512.

### B. *Hercules' Motion for Partial Summary Judgment.*

Only if Hercules can show through the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits that there exists no genuine issue as to any material fact can a summary judgment be granted. In order to make this determination the Court must decide whether it can divine from the documents before it if all issues of material fact have been resolved. The two issues presented in the parties briefs and necessary to this decision will be considered separately.

### 1. Accrual of the Cause of Action.

Plaintiffs, in opposition to the present motion, contend that when the cause of action for breach arose is a material fact in dispute. In support of this assertion they point to the fact that royalty payments under the contract were "highly irregular". As a result, they argue, the date any claim for breach accrued is in dispute. The Court concludes that Plaintiffs' argument is meritless.

The subject contract and its amendments called for yearly payments based on yearly use of a patent right. As a result, the time when a breach did or did not occur is based on when the payment was due, not when it was made. Plaintiffs claim that because the 1972 agreement was silent on when royalty payments were due and the payments were irregular, the date of any breach is a material fact in dispute. This analysis fails to consider the plain language of the various agreements entered into by the parties.

Every amendment or modification of the original contract indicated that unless specifically altered by the amending document the original Polyolefin Contract would govern. Therefore, because the 1972 agreement is silent, the Court must look to the original contract to determine when payments were due.

The original contract specifically provided that payment was due 30 days following the close of the quarter. Such plain language leads the Court to conclude that there can be no question with regard to when the cause of action accrued for failure to make a payment under the contract. This is consistent with Delaware case law which provides that a cause of action for breach of contract accrues at the time of breach. *Freedman v. Beneficial Corp.,* 406 F.Supp. 917, 922–23 (D.Del.1975); *Hood v. McConemy,* 53 F.R.D. 435, 445 (D.Del.1971). Thus, in this case, the statute of limitations began running when payment was due, not when payment was tendered. Since the plain language of the contract between the parties supports this conclusion, there can be no dispute with respect to this fact.

### 2. Statute of Limitations.

The determination of whether the relevant statute of limitations bars any portion of this action requires the Court to resolve two issues. First, whether Hercules, et al. contractually waived their right to defend any action brought by plaintiffs based on the statute of limitations and if so, to what extent. Second, if Hercules, et al. is barred from defending this action based on the statute of limitations because they concealed sales figures and payments due.

### a. *Waiver of the Statute of Limitations Defense.*

As previously noted, Hercules and SGK entered into an agreement on December 2, 1983 providing that SGK would forbear bringing an action for past-due royalties, if any, until May 21, 1984. In return, Hercules purportedly waived any statute of limitations defense. The wording of this agreement appears to have been carefully considered, assuring that any causes of action that were already barred prior to the date of agreement would remain barred. In effect, Hercules took great effort to limit their waiver to only those actions that were not already barred as of December 1, 1983. Although Hercules now complains they only waived their right to defend based on the statute of limitations for a period of a few months (to give them time to determine the legitimacy of the claims) it appears they failed to specify this in the agreement. By the clear language of the agreement, they waived their right to raise a statute of limitations defense on any action not barred prior to December 1, 1983.

Even if the agreement contained ambiguities, which this court does not find it does, the language would be interpreted against the author. *Holiday Homes of St. John Inc. v. Lockhart,* 678 F.2d 1176, 1184 (3rd Cir.1982); *In re F.H. McGraw & Co.,* 473 F.2d 465 (3rd Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 312 (1973); *Tidewater Grain Co. v. S.S. Point Manatee,* 614 F.Supp. 29 (E.D.Pa.1984). In this case, Hercules as the author, had within its power the ability to draft the waiver in any

manner it saw fit. Choosing not to limit the extent of its waiver regarding any claim not already barred the Court concludes Hercules waived any right to defend on those grounds.

Delaware has a three year statute of limitations for actions arising from a breach of contract. Del.Code Ann. tit. 10 § 8106 (1974). Accordingly, no action for breach of contract may be maintained for the years 1972–1979, as the statute of limitations for those years had run prior to December 1, 1983. However, an action for breach of contract on the accounting for calendar year 1980 may still be brought as the Defendants waived the statute of limitations with regard to such a cause of action.

### b. Loss of Defense.

SGK contends that any defense based on the statute of limitations has been lost by the defendants because they concealed sales and royalties due under the contract. As with determining the statute of limitations, the Court must turn to state law to determine what circumstances permit the limitations period to be tolled. *Vernau v. Vic's Mkt, Inc.,* 896 F.2d 43, 45 (3rd Cir. 1990) (quoting *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463–464, 95 S.Ct. 1716, 1721–1722, 44 L.Ed.2d 295 (1975)). Under Delaware law, the statute of limitations is properly tolled under the doctrines of "inherently unknowable" and "fraudulent concealment".[2]

As noted by the parties,[3] there are many similarities between the doctrines of "inherently unknowable" and "fraudulent concealment", however, since differences exist a discussion of each doctrine is required.

### 1. Inherently Unknowable

Generally a statute of limitations begins running when a cause of action arises, even when ignorance of the facts exists. *Began v. Dixon,* 547 A.2d 620, 623

(Del.Super.Ct.1988). "An exception occurs when there are no observable or objective factors which put laymen on notice of a problem, such as in a title defect or certain medical malpractice actions." *Id.* (citing, *Layton v. Allen,* 246 A.2d 794 (Del.Super. Ct.1968) and *Pioneer National Title Insurance Co. v. Child,* 401 A.2d 68 (Del.Super.Ct.1979)). In cases where the statute of limitations is tolled because an action is inherently unknowable the party seeking the relief must show they were blamelessly ignorant of the act or omission and the injury. *Wilson v. Simon,* 1990 WL 63922 (Del.Super.Ct.1990); *Began,* 547 A.2d at 623. Only by showing their own "blameless ignorance" may a person alleging an injury was inherently unknowable use the time the injury manifests itself as the time injury occurred for statute of limitations purposes. *Id.* Upon finding the facts supporting a cause of action were inherently unknowable, a determination must be made as to when a person of ordinary intelligence and prudence would have facts sufficient to put them on "inquiry which, if pursued, would lead to the discovery" of the injury. *Simon,* 1990 WL 63922; (quoting, *Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.Super.Ct.1982) and *Omaha Paper Stock Co. v. Martin K. Eby Constr. Co.,* 193 Neb. 848, 230 N.W.2d 87, 89–90 (1975)).

In this case a plain reading of the contract between the parties amply demonstrates that SGK is unable to prove that the facts were inherently unknowable. Under the original Polyolefin Contract, Ziegler was given the right to inspect the books and data used to calculate the royalty payment and create the accounting. In addition, Ziegler was entitled to hire an independent accountant for purposes of investigating any questions as to the accounting and payments made. As a successor in interest SGK retained these rights when they assumed Ziegler's position under the

---

**2.** The Court is using Delaware law for this analysis as the contract entered into between the parties contained a choice of law clause indicating Delaware law controls.

**3.** The parties often cited cases dealing with fraudulent concealment when discussing the

concept of inherently unknowable and vice versa. While confusion is understandable regarding these theories, it is important to understand the differences so that the application of the cases cited is clear.

contracts. As an experienced business entity SGK should have used its rights under the contracts to protect its own interest.

SGK contends that they had no notice and therefore had no reason to suspect an injury was present until late 1983, however, this assertion fails on two grounds. First, if SGK's contention was adopted it would emasculate the purpose of statutes of limitation and always require actual knowledge of injury as a prerequisite for any limitations period to commence. Second, SGK's contention would shift the burden to protect an injured or aggrieved party's interests. In this case, it would mean that it was Hercules' duty to assure that all of SGK's rights were being protected, despite SGK's contractual rights to assure their own protection.

Finally, at the time the subject contract was entered into a clause was included to protect the rights of the licensor. This protective clause was no less in effect in 1972 through 1980 than it was in 1954 and had SGK at any time exercised their right of inspection, SGK would have been able to enforce their contractual rights in a timely manner.

For these reasons, the Court concludes that SGK was not "blamelessly ignorant" of the facts and therefore cannot avail itself of the "inherently unknowable" doctrine.

### 2. Fraudulent Concealment

 While many of the same facts that defeated SGK's allegation of an inherently unknowable injury have application to the doctrine of fraudulent concealment, the requirements for proof of fraudulent concealment are different.[4] In some respects fraudulent concealment is more difficult to show, as it requires a showing of scienter on the part of the party allegedly concealing the information. *Hood v. McConemy,* 53 F.R.D. 435, 446 (D.Del.1971).

Fraudulent concealment, like inherently unknowable, requires a party to overcome a single threshold question. First it must be shown that there is sufficient evidence from which a judge or jury can find that facts were fraudulently concealed. Only if that question can be answered in the affirmative, does the issue of when the injured party did discover or should have discovered the injury arise so that the time for the statute of limitations to begin running can be set. *Walls v. Abdel–Malik,* 440 A.2d 992, 995–996 (Del.Super.Ct.1982); *Halpern v. Barran,* 313 A.2d 139 (Del.Ch. 1973).

Fraudulent concealment requires a showing of an affirmative act by the party accused of the wrongful behavior. Only if active concealment is shown will the statute of limitations be tolled. *Bradley v. Maryland Casualty Co.,* 563 F.Supp. 602, 606 (D.Del.1983) (quoting, *Halpern v. Barran,* 313 A.2d 139, 143 (Del.Ch.1973)). Some courts hold that if the person either had "actual knowledge of the wrong done or acted affirmatively in concealing the facts" does a basis for a fraudulent concealment claim exist. *Hood v. McConemy,* 53 F.R.D. 435, 446 (D.Del.1971). The majority of Delaware courts hold that an affirmative act is an essential element of fraudulent concealment. *Id.; Walls,* 440 A.2d at 996; *DiBiase v. A & D, Inc.,* 351 A.2d 865 (Del.Super.Ct.1976); *Nardo v. Guido DeAscanis & Sons, Inc.,* 254 A.2d 254 (Del.Super.Ct.1969). In addition to actively concealing facts from the complaining party, the actor must have intended to prevent inquiry or knowledge of the injury. *Lock v. Schreppler,* 426 A.2d 856, 860 (Del. Super.Ct.1981); *Nardo,* 254 A.2d 254; *Hood,* 53 F.R.D. at 446.

In this case, even when the facts are considered in the light most favorable to SGK, there is simply no basis for finding Hercules, et al. fraudulently concealed the potential cause of action from SGK. There is no allegation by SGK that Hercules, et al. affirmatively concealed the sales and use figures applicable under the royalty

---

**4.** Initially, it should be noted that plaintiffs, who oppose this motion, rely only in passing on fraudulent concealment (relying more heavily on inherently unknowable injury). In order to properly claim fraudulent concealment the party must allege the fraud with specificity in their pleadings. Fed.Rule Civ.P. 9(b). The court will undertake this analysis to assure this dispute is fully resolved without need to amend any pleadings.

**254**

agreement. At best what SGK suggests is that Hercules, et al., by presumably fulfilling their contractual obligation, prevented SGK from learning they had a cause of action. The Court is persuaded that a party cannot be charged with fraudulent concealment by doing what is required of them under a contract. Thus, the Court concludes that since no affirmative action was undertaken by Hercules, et al. to conceal information, SGK cannot demonstrate that fraudulent concealment occurred.

Further, the Court is convinced that SGK cannot establish that Hercules, et al. engaged in any behavior that would allow intent to be inferred. All that SGK can show is that Hercules believed they were fulfilling their contractual obligations and when asked for further information provided it. There was no time when, upon SGKs inquiry, that Hercules misrepresented their position.

In view of the long standing business relationship between SGK and Hercules, the contractual rights and duties of the parties and the actions taken pursuant to their contractual obligations, the Court concludes that no fraudulent concealment was committed by Hercules, et al. and therefore, the statute of limitations was not tolled by operation of the fraudulent concealment doctrine.

### III. CONCLUSION

For the reasons stated, summary judgment will be granted for the breach of contract claim for accounting years 1972 through 1979 and will be denied for the breach of contract claim in the accounting year 1980.

An appropriate Order will be entered.