Malcolm P. McLEAN, Individually,
Plaintiff,

v.

Jack ALEXANDER, Daniel D. Friel, Bernard Hessler, Jr., Trustee, Helen June Friel, Trustee, Frederick A. Lang, Robert R. Walsh, Frank B. Francis, Bernard Hessler, Jr., Martin A. Apostolico, Merle R. Aiken, Shelley P. Jones, Thomas B. Baker, Shields & Company, Incorporated, and Cashman & Schiavi, Defendants.

Civ. A. No. 3972.

United States District Court,
D. Delaware.

March 31, 1978.

See also, D.C., 420 F.Supp. 1057.

John J. Schmittinger, of Schmittinger & Rodriguez, Dover, Del., William P. Verdon, and Donald A. Kessler of Meyner, Landis & Verdon, Newark, N. J., for plaintiff.

Richard L. Sutton, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for individual defendants Jack Alexander, Daniel D. Friel, Bernard Hessler, Jr., individually and as Trustee for the children of Defendant Daniel D. Friel, Helen June Friel, Trustee for her children, Frederick A. Lang, Robert R. Walsh, Frank B. Francis, Martin A. Apostolico, Merle R. Aiken, Thomas B. Baker.

B. Wilson Redfearn, of Tybout & Redfearn, Wilmington, Del., Russel H. Beatie, Jr., and John M. Friedman, Jr., of Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Shields & Co., Inc.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., Milton V. Freeman, Edgar H. Brenner, Robert D. Rosenbaum, and Hadrian R. Katz, of Arnold & Porter, Washington, D. C., Francis J. Trzuskowski, of Trzuskowski & Kipp, Wilmington, Del., for defendant Cashman & Schiavi.

Shelley P. Jones, pro se.

OPINION

MURRAY M. SCHWARTZ, District Judge.

Before the Court for resolution is the issue of damages suffered by plaintiff in relying on the misleading report of an accountant as one factor in his decision to purchase all the stock of Technidyne, Inc. A necessary adjunct to the determination of damages is the accountant's cross-claim for indemnification and contribution[1] against the settling defendants, namely the individual shareholders and Shields & Company, Incorporated ("Shields"), an investment banking corporation. All of the co-defendants were released and with one exception indemnified by the plaintiff Malcolm P. McLean ("McLean") as part of a settlement agreement.[2] The facts which are more fully set out in an earlier opinion holding the accountant Schiavi ("Schiavi") of Cashman & Schiavi liable under Rule 10b–5 and common law fraud, may be briefly summarized here. *McLean v. Alexander,* 420 F.Supp. 1057 (D.Del.1976).

In 1970, McLean, who had extensive holdings in companies specializing in both technological and traditional products, purchased all of the stock of Technidyne, a fledgling company whose double beam laser tool, the Model V, among other applications, had the perceived potential of revolutionizing the business of laying pipe. McLean's interest in the private placement of Technidyne was predicated upon many factors, not the least of which was his belief that its laser systems could efficiently replace the arduous 200 year old method of manually aligning and laying pipe. As a prospective buyer, McLean received a management report which has come to be known as the Friel Document,[3] a recommendation by the underwriter known as the Shields Report[4] and the opinion audit of an independent accountant.[5] McLean conferred with Jack Alexander ("Alexander"), President of Technidyne, Bob Walsh ("Walsh"), Vice-President and General Manager, Shelley Jones ("Jones"), Vice-President in charge of Sales and Daniel Friel ("Friel"), major shareholder and chief negotiator of the sale.

During the course of negotiations, McLean learned and relied on two critical pieces of information, both of which proved to be false. The first was that American Vitrified Products ("Amvit") had been

---

1. Doc. No. 81.

2. Doc. No. 173 sets out the terms of the settlement by which all settling defendants but Shelley Jones were released and indemnified. Doc. No. 181 is a stipulation of dismissal between McLean and Jones.

3. Alexander Ex. B ("Alex. Ex. B").

4. Alex. Ex. A entitled Technidyne Private Placement Memorandum.

5. Alex. Ex. C.

Technidyne's exclusive distributor and had sold some 114 units in the 2½ years prior to cancellation of its distribution contract in April 1969.[6] The second was that Jones, the sales manager had sold 41 units to dealers of which 16 were completed within his first three months at Technidyne ending November 1969.[7] Confirming the existence of the 16 sales and impliedly a market for the Model V was the defendant accountant's certified audit · stating that the accounts receivable of $73,733 were "considered fully collectible."[8] The audit was silent regarding Technidyne's dealings with Amvit. As it turned out, statements describing not only the collectibility but also the existence of the accounts receivable were fallacious as were the company's representations concerning the number of sales made by Amvit.

■ On the basis of misrepresentations in the audit made with the knowledge that they were unsupported and investors would rely on them, the accountant Schiavi was found liable under both Rule 10b–5 and principles of common law fraud. There was no finding, however, that he acted in concert with other defendants or that he misrepresented the Amvit relationship. As non-settling defendant, the accountant now asserts cross-claims for contribution and indemnification against all settling defendants, namely the individual principals and shareholders of Technidyne, and Shields, the investment banker. These claims are derivative in the sense that settling defendants are liable to Schiavi only if plaintiff McLean would have prevailed against them on his original action. Whatever liability attaches to any of these settling defend-

ants, it is noted that all but one were indemnified by the plaintiff McLean from any and all claims arising out of this action with the result that no further damages may be assessed against them directly. Rather McLean in the indemnification agreement consented to a reduction of judgment against Schiavi by the amount attributable to the indemnified defendants.[9]

## LIABILITY OF THE INDIVIDUAL DEFENDANTS

Technidyne was a closely held corporation with eleven shareholders of whom only Alexander, Friel, Walsh and Jones were active. The passive shareholders,[10] including one who owned 25% of the company, were not active in the management of the company nor did they actively participate in the sale which precipitated this litigation. Of the inactive shareholders, only Hessler played any part in the sale at all, attending the closing on January 28, 1970 in the role of Technidyne's attorney. He was not privy to the negotiations leading to the sale and thus was unaware of the state of McLean's knowledge.

■ At the closing, a dispute arose as to whether the dealers with whom Technidyne had been dealing had exclusive rights to distribution. Jeter ("Jeter"), McLean's representative at the sale, reiterated McLean's intention to sell directly to contractors. Cautioned that a departure from dealerships could well jeopardize payment of the outstanding accounts, Jeter demanded that the shareholders guarantee the collectibility

---

**6.** Alex. Ex. B at 1; Alex. Ex. A at 2.

**7.** *Id.* 5, 9.

**8.** Alex. Ex. C.

**9.** Doc. No. 173. Jones who sold eight shares settled with McLean but was not indemnified. Doc. No. 181. There appears to be no reason why Jones was not indemnified like the other

settling defendants except the fact that he stipulated to the dismissal without benefit of counsel by proceeding *pro se*.

**10.** Hessler, Lang, Frances, Apostolico, Aiken, Baker, Helen Friel as trustee for her children.

of the receivables. During this exchange, Hessler made inquiry of Jones regarding the nature of the dealership contracts and had the purchase orders produced for Jeter's inspection.[11] All indications are that Hessler was acting in good faith and without knowledge or acquiescence in any deception.

■ Of the remaining passive shareholders only Lang is of possible concern. He held 130 shares, was a co-founder and a director who attended directors' meetings but had little daily contact with Technidyne. As an engineer, he occasionally served as a consultant but had nothing to do with the business decisions of the company. The undisputed evidence indicates his knowledge regarding the stability of the company came exclusively from the active shareholders. Alexander and Walsh told him 114 confirmed sales had been consummated through Amvit and Jones informed him that more than 40 current orders had been received.[12] A review of the record reveals no active role by Lang in the administration or sale of Technidyne and consequently no basis for liability under Rule 10b–5 or principles of common law fraud.

■ In order to prove a Rule 10b–5 violation, one has to show the defendant made material misrepresentations with the intent or knowledge that plaintiff would be misled and that in fact plaintiff did rely on the misrepresentations. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 271 (3d Cir.) (Adams, J., concurring), *cert. denied* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). The elements of common law fraud are essentially the same as 10b–5 in the context of this case. The Delaware courts recognize that a defendant who behaves recklessly without regard for the consequences of his actions must be considered to know or to intend the misrepresentations. *Twin Coach Company v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 284 (Del.Super. Ct.1960); *Barni v. Kutner*, 76 A.2d 801, 806 (Del.Super.Ct.1950).

■ In selling their shares to McLean, the inactive shareholders did not knowingly or recklessly make any misleading statements and the plaintiff in no way relied on their conduct. Consequently, the record fails to support a claim founded upon Rule 10b–5 or common law fraud against the inactive shareholders ("inactive shareholders"). The argument that principles of Rule 10b–5 and common law fraud required all selling shareholders to first ascertain the true financial picture of the company and then communicate it to all prospective buyers is not persuasive. Rule 10b–5 does not contemplate that kind of affirmative duty on the part of persons in the position of inactive shareholders.[13]

■ In contrast, Rule 10b–5 and the principles of common law fraud were violated by the active shareholders. Specifically, Alexander, Friel and Walsh are charged with having misrepresented both the facts underlying Technidyne's current sales and the reasons for terminating its business relationship with Amvit.[14] McLean relied heavily on both misrepresentations. According to his testimony which is credited as honest and forthright, if McLean had been informed of the lack of hard sales, he would have reconsidered whether he wished to purchase a manufacturing business which had no sales,[15] but if he had known of the true reasons underlying Amvit's cancellation, he would not have purchased Techni-

---

11. Doc. No. 94 at 98 (Alexander Deposition); Doc. No. 157 at 150 (Jeter Deposition).

12. Doc. No. 151 at 78, 82 (Lang Deposition).

13. Not raised in the complaint, the further contention that the shareholders as sellers are liable under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), is dismissed for reasons set forth *infra* at 1261.

14. A more detailed statement of the facts surrounding the Amvit affair appears in *McLean v. Alexander*, 420 F.Supp. 1057, 1073 (D.Del. 1976).

15. Doc. No. 178A at 95; 178C at 45.

dyne.[16] Jones, hired nine months after the Amvit cancellation, is charged with having misrepresented only the current sales.

Alexander, Friel and Walsh participated in the ongoing operations of Technidyne and were fully informed that Amvit, its exclusive distributor, had experienced great difficulty marketing the Model V laser systems. Aware as early as May 1968, that Amvit was holding $250,000 inventory in the form of 70 unsold units,[17] Alexander and Walsh negotiated new terms with Amvit and promised relief from the numerous machine failures which Amvit was experiencing. In September 1968, Amvit was informed that engineer Walsh had identified the source of the breakdown.[18] Subsequently, Amvit gave him a service list which reflected a total of about 20 units then in service. Unfortunately, the technical problems went unabated and throughout late 1968 the relationship with Amvit continued to disintegrate despite extensive negotiations. Finally, in December 1968, Alexander and Friel met with Amvit to discuss Amvit's refusal to accept additional units and its disposition of the $250,000 inventory. Their pleas that Amvit continue to accept units in reduced quantities if necessary or loan Technidyne $50,000 were summarily rejected. Having reached no acceptable settlement, Technidyne formally cancelled the Amvit exclusive distributorship. Continuing representations by the active shareholders that the distributorship failed because Amvit preferred to concentrate on its own products are rejected as unconvincing. The lack of success in marketing the Technidyne units because of their design and the high degree of product malfunction more likely explains the demise of the relationship.

Without its exclusive distributor, Technidyne's already grim financial picture turned bleak. Attention focused on the sales aspect of the operation. Interviewed by Al-exander, Walsh and Friel, Jones was hired as sales manager in the summer of 1969 to revitalize the then defunct marketing program. In a short time, with the aid of two salesmen, Jones reported marked success purporting to have netted 16 sales in less than three months and 41 by the time of the sale to McLean in January 1970.

Despite Jones' alleged success in marketing the Model V, Technidyne continued to be plagued with financial difficulty and finally sought outside financing. Specifically, Friel, a substantial shareholder[19] and spokesman for Technidyne, undertook the major role in obtaining a buyer. He contacted Tim Evans, a business acquaintance employed by investment banker Shields, who advised that a private placement would best achieve Technidyne's goals. Friel set to work providing Shields with information for distribution to potential investors. Meanwhile, Friel drafted his own four page report ("Friel Document") which stated that "Amvit, with a limited sales effort, sold 114 units in 2½ years" and that the current sales effort had generated 41 orders within a limited geographic area in the off season.

The circumstances of the sale of Technidyne to plaintiff McLean is set out in greater detail elsewhere.[20] Suffice it to say that in late 1969, McLean became interested in Technidyne through an engineer acquaintance of Evans. After a series of discussions in early January 1970, with Friel, Alexander, Walsh and Jones, McLean was disposed to buy a substantial share in Technidyne and by January 22, 1970, he decided to buy the company outright.

The Friel Document, delivered to Jeter and McLean in advance of the closing on January 28, 1970, was more fiction than fact given that almost all the units held by Amvit were known by Friel to be unsold, and that the 41 sales were not in fact sales

16. Doc. No. 178B at 128.

17. McLean Ex. 13.

18. Alex. Ex. 81.

19. Although Friel held only 20 shares in his own name, an additional 110 were held in trust for him or his family.

20. *McLean v. Alexander, supra,* 420 F.Supp. at 1062–67.

but consignments. Notwithstanding Friel's knowledge of the true status of the Technidyne sales picture, he persisted in perpetuating the fantasies contained in his report during the January meetings with McLean and McLean's assistant, Jeter. Ultimately on the basis of representations contained in the Friel Document and those conveyed in the face to face meetings with the active shareholders, McLean purchased all of the stock of Technidyne by Jeter's execution of a stock purchase agreement on January 28, 1970. Friel's active role in the sale of Technidyne culminated in his signing the sales agreement with McLean.[21] Despite his personal knowledge that the information was inaccurate and misleading, Friel warranted on behalf of the stockholders that the reports issued by Shields and Schiavi were accurate and the accounts receivable collectible.[22]

Friel was not alone in persuading McLean to buy Technidyne. Besides Friel, Alexander and Walsh participated in the negotiation session of January 6th with Jeter; all of them and Jones attended a January 13th meeting with McLean. At these meetings, the current sales activity and the prior business relationship with Amvit were discussed and misrepresented. McLean and Jeter were repeatedly told there was a viable market for Technidyne laser systems as reflected by the 41 hard sales allegedly consummated under Jones' direction. They were also informed that the prior sales program of Amvit was terminated because Amvit preferred to concentrate on selling its own products. Meanwhile, throughout the course of these negotiations, Friel, Alexander and Walsh were aware that Amvit terminated its sales agreement because it could not successfully market the Model V units.

Throughout the proceedings, the defendants continued to maintain that the 41 dealer transactions were true sales. They argued that payment was jeopardized by McLean's avowed policy to depart from dealerships as a distribution method in favor of dealing directly with consumers. This position is unsupported by the record. The underlying "sales" documentation containing future delivery and payment dates belies hard sales. One copy of a purchase order for 10 units bore a handwritten legend stating that "if the units are not sold Technidyne will take back with no billing. . . ."[23] Other purchase orders, although less explicit, provide evidence of the non-sales character of these transactions. The purchase order for customer L. B. Smith indicated that the units were to be shipped A.S.A.P. yet it was known they were being held in the warehouse. Finally, despite an acute cash flow problem, purchase orders requiring payment on October 23, 1969 and December 7, 1969 were invoiced as due on December 30, 1969 and mid-January respectively.[24] The documentation combined with the statements of the dealers point inextricably to the conclusion that the orders were merely consignments.[25]

21. Having persuaded all the shareholders to sell, Friel obtained their power of attorney. Apparently, Friel also persuaded Alexander and Jones who were not anxious to relinquish the entire business. Doc. No. 97 at 101 (Jones Deposition).

22. Doc. No. 1 at Ex. D. The Stock Purchase Agreement at paragraph 3 provides:
"The Stockholders hereby represent and warrant as follows:
(d) financial statements [including unaudited statements and the audit statement certified by Schiavi] are accurate and complete. . .

(j)(xi) all accounts receivable of the Company outstanding as of the date hereof . . . are collectible at the aggregate recorded amounts thereof. . . .

(n) The private placement Memorandum dated November 20, 1969 [Shields Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of circumstances under which they were made, not misleading."

23. Alex. Ex. H. (2)b.

24. Alex. Ex. E6(g); Alex. Ex. E(1); Alex. Ex. F(2)(b); Alex. Ex. F(2)(a).

25. Doc. No. 107 at 8 (Deposition of Methvin, principal of Southern Laser); Doc. No. 110 at 16 (Deposition of Norman representing L. B. Smith); Doc. No. 109 at 18 (Deposition of Robbins of Robbins Instrument Service Co.).

Alexander, Friel and Walsh urge that they had no reason to know that the orders were not actual sales because the sales information was controlled by Jones. Jones in turn disavows any knowledge that the purchase orders represented less than consummated sales because they were negotiated by his salesmen. Both positions are wholly unconvincing. Depositions of the salesmen demonstrate Jones had knowledge of the consignment nature of each order.[26] Then, however bold Jones was in inflating his rate of success, all orders were submitted to management for approval and monitoring of payment. Given the acute cash shortage, the principals could be expected to have scrutinized incoming orders rather carefully. Accordingly, it is concluded that the active shareholders either had knowledge of the lack of current sales or recklessly misrepresented the state of their knowledge concerning sales.

Before concluding the discussion regarding the liability of the active shareholders, the interaction between the principals and the accountant is worth noting. Schiavi may well consider Walsh the principal person behind Technidyne because it was he who requested the audit, provided the information on sales and pushed for early completion of the audit.[27] On one occasion Schiavi uncharacteristically sought clarification on conflicting payment dates for an account. Walsh replied that a deferred payment schedule had been arranged, never hinting that no payment at all was forthcoming.[28] Schiavi accepted such responses from management at face value ultimately satisfied with a letter from Alexander attesting to the accuracy of the information so provided.

In response to pressure from Walsh, Schiavi departed from normal accounting standards notably dispensing with the receipt of confirmation letters from customers attesting to their purchase of Technidyne units. Instead Schiavi received and accepted telegrams, one of which was forged by a Technidyne salesman; another was a non-responsive statement sent by a customer who was misled by a salesman as to its purpose. This kind of deception is characteristic of the dishonesty which infected the entire Technidyne operation affecting the customers, the accountant and ultimately plaintiff who was deceived into believing he was buying a business which manufactured a salable product when in fact its sales were nil.

It is clear from the foregoing that the sale of Technidyne took place under a cloud of duplicity violative of Rule 10b–5 and the principles of common law fraud. The active shareholders knowingly made substantial material misrepresentations with the intent that a buyer rely upon them which in fact McLean did. They also deceived their accountant. As a result, the active, individual shareholders must bear a substantial share of the damages to be awarded to McLean. Accordingly, Schiavi's cross-claim for indemnification and contribution is properly brought against the active shareholders.

## LIABILITY OF SHIELDS & COMPANY, INCORPORATED

■ Shields is an investment firm whose function is to locate sources of financing for its clients. In preparation for the private placement of Technidyne, Evans of Shields prepared a memorandum for distribution to private investors. The resulting document known as the Shields Report was based on information supplied by Friel. It reported

---

**26.** Doc. No. 150 at 19–20 (Deposition of Frew). At least one salesman stated that before entering into the "buy-back" arrangement, he obtained Jones' personal authorization. Doc. No. 149 at 34–35, 55–57 (Deposition of Thomas). Although he denies giving his express consent to any consignment, Jones nonetheless admits that he would promise a customer a "buy-back" deal confident it would never materialize. Doc. No. 97 at 144 (Deposition of

Jones). Jones also unconvincingly asserts that despite personal contact with several of the customers, he was unaware they were consignees.

**27.** Doc. No. 103 at 25–26, 75–76 (Deposition of Schiavi).

**28.** *Id.* 86.

that through Amvit, Technidyne had sold 36 units in 1967; 60 in 1968 but that finally "[p]roblems with this method of distribution led to termination of the relationship in April 1969 at which time the company began to sell the device direct." [29] It further reported that Technidyne had placed sixteen systems within three months. Further, it predicted a bright future for Technidyne pointing to "200 potential candidates for dealerships" among whom "enthusiasm . . . has been running high." [30] Thus the Shields Report in substantial part echoes the Friel Document, a not surprising result given their common genesis.

Shields conducted no independent investigation of Technidyne; its prognosis regarding Technidyne's future was based entirely on representations made by management. However, unlike Schiavi, Shields did not purport to express an independent opinion; the cover of its report bore the disclaimer "This memorandum prepared by the undersigned at the request of the above-named Company is based upon information furnished by officers of the Company and is not guaranteed by the undersigned."

Shields, however, expressed the view that $600,000 was a reasonable price for a one-third interest in Technidyne, thus giving rise to the purchase price of $1.7 million expended by McLean for full proprietorship. Shields further opined that "Technidyne's management has demonstrated a record of maturity and good planning and that the shares offered, while highly speculative, afford the investor an opportunity for unusual growth." [31] For services in locating a buyer Shields received $80,000 although its major contribution appears to have been repackaging company misinformation over the Shields name.

A participant in the sale of Technidyne, Shields was named as a defendant by Mc-

Lean in his complaint which alleged fraud generally and violations of 10b–5 specifically.[32] After discovery and during trial, Shields entered into an agreement whereby in exchange for $45,000 McLean indemnified Shields for any claims arising out of this action. Thus, in order for Schiavi to obtain contribution from Shields, Schiavi must demonstrate that Shields, like the individual shareholders, is liable under the complaint as drafted by McLean.

Under 10b–5 and common law fraud, when misrepresentations are alleged, reliance on those misrepresentations must be demonstrated. *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir. 1965). *Nye Odorless Incinerator Corp. v. Felton,* 5 W. W. Harr. 236, 162 A. 504 (Del.Super.1931). There is no evidence that McLean relied on the Shields Report as an independent document but rather countervailing evidence indicates he did not.[33] McLean himself testified that he in no way inferred that Shields obtained the information from outside the company or from Amvit directly.[34] Given that Shields indicated its source of information as management, it cannot be said without more that a per se violation occurred. *See Denison Mines Ltd. v. Fibreboard Corp.,* 388 F.Supp. 812 (D.Del.1974). The legend on the report suggests that reliance on it as an independent statement would be foolhardy. In contrast, the accountant's audit purported to be an independent analysis of the company and therefore more reliable. The facts adduced at trial indicate that in contrast to his reliance on the audit, McLean did not rely on the Shields Report as an independent document. Thus, there is no violation by Shields of Rule 10b–5 or the principles of common law fraud.

The accountant Schiavi contends, however, that Shields is liable under section

**29.** Alex. Ex. A at 2.

**30.** *Id.* 6.

**31.** *Id.* 1.

**32.** Counts 5, 6 and 7 of the complaint allege fraud generally against Shields. Counts 15, 16 and 17 assert the 10b–5 claim against it.

**33.** In its earlier opinion the Court pointed out that "McLean relied upon . . . the Shields Report based [as it was] on information supplied by the company." *McLean v. Alexander, supra,* 420 F.Supp. at 1077.

**34.** Doc. 178B at 137.

12(2) of the 1933 Act[35] although no violation of this section was asserted in the complaint or voiced at trial. Prohibiting misrepresentations by a seller, this section is violated when negligence is alleged and defendant fail to demonstrate its absence. Thus in a section 12(2) case, upon an allegation of any misrepresentation, the defendant assumes the burden of proving that he could not have known of the misrepresentation while exercising reasonable care. *Hill York Corp. v. American Intern Franchises, Inc.,* 448 F.2d 680 (5th Cir. 1971); *Jackson v. Oppenheim,* 411 F.Supp. 659, *affd.* 533 F.2d 826 (2d Cir. 1976).

■ Shields would be unfairly prejudiced if it were required to defend against a section 12(2) theory never mentioned in the complaint, during protracted discovery or in the pre-trial order, but only after trial has long since ended. Further, it would prejudice the parties here who collected no evidence on the acceptable standards of the trade or on whether Shields is a control person or seller within the meaning of section 12(2) as interpreted by the Third Circuit in *First Trust & Savings Bank v. Fidelity-Philadelphia Trust Co.,* 214 F.2d 320, 324 (3d Cir. 1954).

Although Shields' work is less than commendable, the Court declines to convert what was presented as a 10b–5 and common law fraud suit into one bottomed on section 12(2). To do so would emasculate the decision in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that negligence is insufficient for 10b–5 liability, by permitting importation of another theory of liability after trial which is predicated upon negligence.

Defendant's argument that the Court must consider applicable legal principles whenever raised is rejected as an overstatement. In *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 889 (3d Cir. 1975) ("*Rochez II*"), the court of appeals considered for the first time the vicarious liability of the defendant as provided by section 20(a) of the 1934 Act. However, its decision did not alter the burden of proof nor upset the positions of the parties; it therefore cannot be read as requiring consideration of every theory of liability advanced after trial. That *Rochez* was stating the exception rather than the rule is reflected in the language of the court in a later opinion which acknowledged that "failure to put into evidence all the proof necessary for sustaining a judgment is generally fatal" and that "a case is ordinarily not remanded to give a party the opportunity to supply the missing evidence." *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 891, 894 (3d Cir. 1975) ("*Rochez III*"), *cert. denied* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). Having found no liability in either common law fraud or under 10b–5, the Court concludes Schiavi's cross-claim against Shields for contribution and indemnification must fail.

## SCHIAVI'S MOTIONS

Before moving to the computation of damages and Schiavi's cross-claims for contribution and indemnification against the active shareholders, it is necessary to dispose of two motions brought on by defendant Schiavi. The first seeks permission to reopen the record for the purpose of adding

**35.** Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* provides:

Any person who—

 * * * * * *

 (2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

the work papers of the accountant. This he claims is necessary to establish causation as it is fundamental that one is liable only for the damages resulting from one's own conduct. Plaintiff McLean objects to this motion arguing that the probative value of these records goes to the liability of Schiavi, a fact already established on the trial record. A cursory glance at the work papers appears to support the latter view. Included in the exhibit are the audit and purchase orders already in evidence in addition to assorted papers which Schiavi consulted in the course of preparing his audit. Their relevance to the issue of damages is not readily apparent.

Whatever their purpose, there was ample opportunity to provide all relevant evidence during the several years of discovery and the 18-day trial spanning three months during which time Schiavi was represented by counsel.[36] It was incumbent on the then counsel to consider the complexities of the case and the cross-claims lest the record be incomplete or the evidence submitted piecemeal. The work papers were in the hands of the offering party all along and could not be added now without plaintiff's full cross-examination of them. Having considered the character of the additional evidence, the timing of the motion and the likelihood of prejudice to the plaintiff if the motion were granted, it is concluded that the interests of fairness warrant a denial of the motion. 6A *Moore's Federal Practice* ¶ 59.04[13], at 59–33. *See also Rochez III, supra*, 527 F.2d at 894 n. 6.

Defendant Schiavi's second motion seeks to clarify the pre-trial order pursuant to F.R.Civ.P. 60(b) and goes to the issue of whether the accountant waived his right to contribution under the federal securities law. The pre-trial order provides in pertinent part: "Cashman & Schiavi has filed a cross-claim against co-defendants seeking indemnity, *limited*, by its counsel's letter of July [sic] 25, 1974, to contribution in the event of a joint and several liability to which the Uniform Joint Tortfeasors Act would apply."[37] (Emphasis added.)

Throughout the proceedings, through letters and at pre-trial conferences, defense counsel reiterated that he would seek contribution under the Uniform Joint Tortfeasors Act, 10 *Del.C.* §§ 6301 *et seq.* Specifically, the letter of June 25th stated:

"It is the intent of the cross-claim to seek contribution from the other defendant or defendants concerned in the event that Cashman & Schiavi and one or more of the other defendants are determined by the Court to be jointly liable to plaintiff upon a joint and several liability to which the Uniform Joint Tortfeasors Act is applicable. Cashman & Schiavi do not contend and will not produce testimony or evidence with any intention of affirmatively establishing that any one or more of the co-defendants are in any manner liable to plaintiff, or are guilty of any wrong doing or other acts in the premises predicating any liabilities to the plaintiff."[38]

By express reference to the Uniform Joint Tortfeasors Act, counsel seemingly limited the cross-claim to recovery under that Delaware statute. In the pre-trial conference of September 17, 1975, trial counsel repeated that he had "a cross-claim for apportionment in the event that the Court should find common law liability on the fraud count."[39] At that same conference, he referred to his June 25th letter and repeated his intention not to attempt to establish the liability of any co-defendant.

Trial counsel's position now urged by subsequent counsel is that agreement to the use of the word "limited" in the pre-trial

---

**36.** Counsel were instructed by the Court that all issues going to both liability and damages were to be tried at one trial. Doc. No. 161 at 33–34. Two different counsel represented Schiavi. One tried the case. Upon determination of liability he withdrew and a second counsel entered his appearance and has continued to represent defendant Schiavi.

**37.** Doc. No. 159 at 5. Reference to the July 25, 1974 letter is understood to mean the letter of June 25, 1974.

**38.** Doc. No. 1 at Ex. B.

**39.** Doc. No. 161 at 32.

**1264**

order was predicated on trial counsel's agreement not to offer independent evidence to establish the liability of the co-defendants and did not create a limitation on his theories of recovery under his cross-claim. That trial counsel engendered confusion between these two points is evident from the record. Discussion regarding the meaning of the pre-trial order arose on January 7, 1976, the sixteenth day of trial, when defense counsel referred to his claim for contribution under Rule 10b–5. In response to plaintiff's statement that all parties were bound by the pleadings and the pre-trial order, defense counsel agreed noting that his cross-claim for contribution was asserted in the pleadings and pre-trial order. Finally, the Court read from the pre-trial order and asked if everyone understood that defendant seeks "indemnity, limited, by its counsel's letter of July 25, 1974, to contribution in the event of a joint and several liability to which the Uniform Joint Tortfeasors Act would apply" and all parties agreed.[40]

Several months later on April 14, 1976 at oral argument, defense counsel reasserted his cross-claim for contribution under 10b–5. When the Court sought to clarify his position, counsel asked in disbelief whether the Court was "suggesting now that I somehow waived a right . . . to contribution for 10b liabilities."[41] Other sections of the transcript disclose that defense counsel was uncertain whether a right to contribution existed under the federal securities law.[42] Apparently he concluded that absent a specific federal statute, the right

to contribution under federal securities law was necessarily controlled by state law.[43]

▪ In response to plaintiff's contention that defendant waived his right to contribution under the federal claim, defendant urges that his express reliance on contribution under state law does not and was not intended to defeat his federal right. Because litigators are expected to have the necessary command of the substantive law at issue, the argument that waiver by an attorney requires an intentional abandonment of a known right is summarily rejected. Cases offered in support of that position are inapposite in that they do not deal with attorneys who are presumed capable of affirmatively asserting their claims.[44]

▪ However, although Schiavi's trial counsel was not fully conversant with the emerging doctrine of contribution in federal securities law, plaintiff will not be permitted to capitalize on a record which indicates the accountant's intent to assert a contribution claim against the individual defendants. At all times plaintiff was aware of an outstanding claim for contribution and proceeded accordingly. Thus, I am unpersuaded that plaintiff truly believed or acted upon a belief that defendant waived his right to contribution under the federal securities law. There is no evidence that plaintiff reasonably relied upon defendant's position unless one were prepared to say and recognize as a detriment, partial frustration of plaintiff's possible trial strategy of isolating the accountant defendant.[45]

40. Doc. No. 178P at 73–74.

41. Doc. No. 201 Ex. E.

42. At trial, counsel stated to the Court, "my research, while not exhaustive, doesn't disclose to me one way or the other whether rights to contribution are available to parties under 10(b)(5)." Doc. No. 178P at 72.

43. When asked by the Court whether his claim for contribution would survive absent a finding of common law liability, trial counsel replied "I believe so. The Joint Tortfeasors Act doesn't make any exclusions. It's a part of the substantive law of this State and I think it would be gratuitous to except 10(b) liabilities. There are no other exceptions." Doc. No. 201 Ex. E.

Counsel made no mention of his right of contribution under the federal securities laws.

44. *Bechtel v. Liberty National Bank*, 534 F.2d 1335, 1339–40 (9th Cir. 1976); *United States ex rel. Turner v. Rundle*, 438 F.2d 839, 843 (3d Cir. 1971).

45. If it were plaintiff's trial tactic to settle with all other defendants so as to be able to concentrate its attention on the accountant, one cannot say with any degree of assurance that the stratagem of experienced and competent plaintiff's counsel was dictated solely, if at all, by a desire to capitalize on the muddled record with respect to defendant accountant's claim for contribution. For example, settlement re-

Accordingly, defendant's agreement to the limiting language of the pre-trial order will not be viewed as waiving a right to contribution under the federal securities laws.

In addition to the right of contribution under federal securities laws, defendant has a statutory right to contribution under state law based upon the Court's finding of common law fraud. The relatively straightforward character of Delaware law as contrasted with the undeveloped and unchartered federal law of contribution creates a temptation to resolve the question of damages exclusively on state law. However, because the claims for contribution are based on both state and federal claims, the Court will proceed to a determination and allocation of damages under each. In so doing, the Court seeks to avoid piecemeal appeals to the appellate court for its consideration of different aspects of the cross-claim, a development which would further delay resolution of the case pending now for several years. *See Rochez III, supra,* 527 F.2d at 895 (remanded for the third time). In addition, it is a generally accepted rule that where two theories of damages lie, claimant is entitled to the greater of the two.[46] However, when plaintiff has limited his recovery by indemnifying all but two of the defendants (the accountant and Jones), the maximum recovery may well be the lesser of the two sums. In any case, having found common law fraud and a 10b–5 violation, it is desirable to determine the difference, if any, between the federal and state forms of recovery and the effects of claims for contribution and indemnification on each.

### CONTRIBUTION AND INDEMNIFICATION

Schiavi as non-settling defendant filed a cross-claim seeking contribution and indemnification against all settling defendants. The principle of indemnification serves to shift the entire burden from one defendant to another whereas the effect of contribution is to share the burden among the defendants. Until recently there was no acknowledged right to contribution with the result that a joint and several tortfeasor assumed responsibility for the entire judgment and had no recourse against the co-defendants. Actions for contribution seek to limit the amount of loss to one's proportionate share by allowing the defendant to obtain contribution from co-defendants up to their proportionate share. However, it is fundamental that for principles of contribution to apply, one seeking contribution must be assessed or have paid more than his proportionate share.

In contrast to the recent development of the doctrine of contribution, indemnification was recognized from early common law and permitted, for example, one charged with vicarious liability to proceed against the actual wrongdoer for the full amount of the damages. The parties to indemnification usually bore a special relationship to each other such as employer-employee or had a contractual agreement creating indemnification. From these limited circumstances the right to indemnification expanded as courts sought to mitigate the harsh rule prohibiting contribution by applying principles of indemnification. Thus, instead of the less culpable defendant paying all the damages, he would pay none. *United Air Lines, Inc. v. Wiener,* 335 F.2d 379, 402 (9th Cir. 1964); *Kantlehner v. United States,* 279 F.Supp. 122, 128 (E.D.N.Y.1967). However, preferable the result, this "all or nothing" approach was itself critically received and proponents of contribution obtained new support, sometimes under the guise of "partial indemnification." *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972).[47]

---

moved several litigants represented by prestigious law firms and reduced McLean's exposure by $1.3 million in outstanding notes.

**46.** 3 L. Loss, Securities Regulation 1624 (2d ed. 1961).

**47.** The *Dole* court assessed liability under a theory of indemnification rather than contribution because the statute governing contribution required a joint judgment and suit against the defendant employer was barred by provisions of the workmen's compensation laws. Other barriers prohibiting the use of contribution

*See also* Werner, *Contribution and Indemnification in California*, 57 Cal.L.Rev. 490, 516 (1969).

The principal argument opposing the use of contribution was that unlawful conduct would be deterred only by assigning full responsibility to each tortfeasor. Also militating against acceptance of the doctrine was the concern that claims for contribution against settling defendants would deter settlement. These considerations were finally overborne by recognition of possible collusion between settling defendants and plaintiffs and the realization that fundamental fairness demands a sharing by wrongdoers in setting the wrong right. Thus, the jurisprudence of contribution emerged.[48] *See generally* Note, *Contribution Under the Federal Securities Laws*, 1975 Wash.U.L.Q. 1256.

 Indemnification and contribution have received perfunctory treatment in federal securities case law. Some courts have permitted indemnification claims to be pled and others have acknowledged the possibility of indemnity where one defendant is clearly more culpable than the other. *Muth v. Dechert, Price & Rhoades*, 391 F.Supp. 935 (E.D.Pa.1975); *Carpenter v. Hall*, 311 F.Supp. 1099 (S.D.Tex.1970). However, the great weight of authority establishes that

indemnification against actual wrongdoing as contrasted with negligent conduct is considered void as to public policy and accordingly indemnification contracts between intentional tortfeasors will not be enforced by the federal court.[49] *Globus v. Law Research Service, Inc.*, 287 F.Supp. 188 (S.D.N.Y.1968), *aff'd* 418 F.2d 1276 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), (*"Globus I"*); *Odette v. Shearson, Hammill Co.*, 394 F.Supp. 946 (S.D.N.Y.1975); *Tucker v. Arthur Andersen & Co.*, CCH Fed.Sec.L.Rep. ¶ 94, 544 (S.D.N.Y.1974); *Altman v. Liberty Equities Corp.*, 54 F.R.D. 620 (S.D.N.Y.1972). *But cf. Gould v. American Hawaiian Steamship Co.*, 387 F.Supp. 163, 167 (D.Del.1974). Indemnification agreements between plaintiff and defendant are not necessarily subject to the same considerations of public policy given that plaintiff has the free choice to sue in the first place. If plaintiff wishes to reduce its claim or indemnify the defendant in order to effectuate settlement, one cannot conclude that such a decision is impermissible.

 Contribution, in contrast to indemnification between defendants, has been recently recognized as a useful method of allocating the damages fairly among all wrongdoers without absolving one at the

---

have been procedural, *e. g.*, prepayment by defendant of the total damages has often been statutorily required before defendant could seek contribution. Note, *Contribution Under the Federal Securities Laws*, 1975 Wash.U.L.Q. 1256, 1283. Annot. *Contribution or Indemnity Between Joint Tortfeasors on Basis of Relative Fault*, 53 A.L.R.3d 184, 196 (1973).

**48.** Considered in 1964 to be the minority rule, the right to contribution has been statutorily recognized by almost every state. In at least nine jurisdictions, notably Iowa, Maine, Minnesota, District of Columbia, Louisiana, Nevada, Pennsylvania, Tennessee and Wisconsin, the courts established the right. *See* Note, *Settlement in Joint Tort Cases*, 18 Stan.L.Rev. 486 (1966); Prosser, Handbook of the Law of Torts (4th ed. 1970). In addition, 36 jurisdictions have adopted provisions for contribution in their blue sky laws, governing the sale of securities. One of those states is Delaware whose statute was enacted after commencement of this action. 6 *Del.Code* § 7323(b); Note, *supra*, n. *, p. 33, Wash.U.L.Q. at 1268.

**49.** This is not to say that the innocent party whose liability attaches as a matter of law may not obtain indemnity from the actual wrongdoer. For example, when a corporation incurs liability for the acts of its employees, it may seek indemnification from the employees. *Thomas v. Duralite Co., Inc.*, 386 F.Supp. 698 (D.N.J.1974), *aff'd in part*, 524 F.2d 577 (3d Cir. 1975); *deHaas v. Empire Petroleum Co.*, 286 F.Supp. 809, 815–16 (D.Colo.1968); Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy In Pari Delicto, Indemnification and Contribution*, 120 U.Pa.L.Rev. 597, 652–59 (1972). Professor Ruder stated his difficulty in conceiving of indemnification in a 10b–5 securities action unless negligence were actionable under 10b–5. *Id.* 659. Under *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), active wrongdoing alone gives rise to liability under Rule 10b–5 and consequently Rule 10b–5 is an inappropriate context for application of the principles of indemnification, in his view.

expense of the other. *Globus v. Law Research Service Inc.,* 318 F.Supp. 955 (S.D.N.Y.1970), *affd. per curiam,* 442 F.2d 1346 (2d Cir.), *cert. denied,* 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254 (1971) ("*Globus II*"). *See Gould v. American Hawaiian Steamship Co., supra,* 387 F.Supp. at 170; *Alexander & Baldwin, Inc. v. Peat, Marwick, Mitchell & Co.,* 385 F.Supp. 230 (S.D.N.Y.1974); *Odette v. Shearson, Hammill Co., supra* at 957–58; *deHaas v. Empire Petroleum Co.,* 286 F.Supp. 809, 815–16 (D.Colo.1968), *aff'd in part and vac. in part,* 435 F.2d 1223 (10th Cir. 1970). In addition to the explicit provisions of the federal securities laws establishing the right to contribution,[50] the court in *Globus II* determined that an underwriter who knowingly violated Rule 10b–5 had a right to contribution. Thus the principles emerge that no intentional wrongdoer may shift the entire responsibility for the injury he has caused to another defendant by indemnification[51] but all wrongdoers may properly share in the apportionment of damages via claims for contribution.

 Applying these tenets to the instant case, the starting point is the finding that the individual shareholders, Alexander, Friel, Walsh and Jones are jointly and severally liable with Schiavi under principles of 10b–5 and common law fraud. Under established precedent, the accountant as an actual wrongdoer cannot shift the entire loss to co-defendants by indemnification but can obtain contribution under the federal securities and state laws.[52] Because McLean has released Alexander, Friel, Walsh and Jones from further liability to him, no additional monies will be paid by them to McLean directly. Release by the plaintiff, however, does not preclude cross-claims for contribution by Schiavi. A joint and several tortfeasor who discharges the common liability may obtain contribution from settling defendants. In addition to release, McLean indemnified Friel, Alexander and Walsh. The effect of this indemnification reduces the total damages which must be paid by Schiavi to McLean by the amount attributable to these indemnitees.[53] Jones was not indemnified by McLean and consequently a defendant in the position of Schiavi who must pay the entire judgment would ordinarily obtain a judgment against Jones for contribution but defendant could not reduce the amount he pays plaintiff by the amount attributable to Jones. In this matter, it is important that plaintiff has urged that all

**50.** Section 11(f) of the 1933 Act, 15 U.S.C. § 77k(f) and section 9(e) and section 18(b) of the 1934 Act, 15 U.S.C. §§ 78i(e), 78r(b) (1970).

**51.** The federal case law repudiating indemnification agreements among actual wrongdoers may be read in conjunction with the liberal indemnification provisions of 8 *Del.C.* § 145. Unlike prior law which simply empowered a corporation to indemnify, section 145 statutorily provides that a director "shall be indemnified if he is successful in defense of any action, suit or proceeding." However, there is no indication that the company must or should indemnify directors who participate in wrongdoing. Comments to the section state that even indemnifying amounts paid in settlement "would subvert the purpose of the derivative suit of bringing faithless corporate directors and officers to account for misdeeds." Folk, E. The Delaware General Corporation Law 100, (1972). A finding or inference of wrongdoing by defendant has generally precluded indemnification under this section. *See, e. g., Merritt-Chapman & Scott Corp. v. Wolfson,* 264 A.2d 358 (Del.Super.1970).

Despite judicial repudiation of indemnification agreements between intentional tortfeasors, insurance coverage of directors is commonplace. Although generally excluding active wrongdoing, some policies may be more expansive than the courts would permit through indemnification. The possibility of this anomaly was raised by Jennings & Marsh, Securities Regulations 215 (3d ed. 1972).

**52.** There is a statutory right to contribution in Delaware pursuant to 10 *Del.C.* § 6302(a) which provides: "The right of contribution exists among joint tort-feasors."

**53.** This situation with respect to state law is controlled by 10 *Del.C.* § 6304(b) which provides:

"(b) A release by the injured person of one joint tort-feasor does not relieve him from liability to make contribution to another joint tort-feasor unless the release is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the pro rata share of the released tort-feasor, of the injured person's damages recoverable against all the other tort-feasors."

the shareholders be treated as one entity with the result that Jones would be among the indemnified.

Against this background, attention now shifts to the difficult problem of devising a method of just allocation of damages among the multiple defendants. There are several ways to compute proportionate shares. The task of the Court is to choose the one most fair to all parties, keeping in mind that equity is the cornerstone of remedial relief. One begins with a computation of the actual damages.

## COMPUTATION OF DAMAGES

■■■■ Damages in federal securities cases are traditionally computed on the basis of out-of-pocket costs measured by the difference between the actual value of the stock and the amount actually paid.[54] *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 411–13 (3d Cir. 1974) ("*Rochez I*"). The terms of the sales contract provided, in essence, that McLean would pay $1,950,000 for full ownership of Technidyne. Specifically, he would and did satisfy an outstanding debt of Technidyne in the amount of $250,000.[55] In addition, McLean paid a cash down payment of $399,998.10 and agreed to pay the balance of $1,300,-001.85, represented by promissory notes, in deferred payments.[56] The balance was never paid off as such. Rather, as a result of a later settlement agreement executed with the shareholders, they forgave the $1.3 million in outstanding notes in exchange for

$70,000 cash from McLean.[57] Thus, in computing the amount actually paid, there is the temptation to consider only the amount of cash which changed hands, namely the $399,998.10 down payment, the $70,000 expended to cancel the notes and the $250,000 debt which McLean satisfied. The total of these amounts is $720,000. However, McLean's obligation was to pay $1,950,000 and had he paid the entire amount in cash and the shareholders returned $1.3 million in cash as part of that settlement, the settlors would be entitled to count that $1.3 million toward their share of the damages. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27 (2d Cir. 1976). Given that the undisputed value of the business and hence the stock at the time of purchase was zero,[58] the amount of $1,950,-000 is a beginning point to which is added whatever consequential damages accrued.

## CONSEQUENTIAL DAMAGES

■■■■ A wrongdoer is generally liable for all injuries which foreseeably result from his wrong. From this principle has arisen the well-established practice of awarding consequential damages. However, in order to obtain consequential damages, the plaintiff must establish with reasonable certainty that those damages result directly from defendants' wrongdoing. *Zeller v. Bogue Electric Mfg. Corp.,* 476 F.2d 795, 802 (2d Cir.), *cert. denied* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). Defendant has urged that given the speculative nature of Technidyne, McLean under-

---

54. For a discussion of the out-of-pocket measure and other theories of damages, see Jacobs, *The Measure of Damages in Rule 10b–5 Cases,* 65 Geo.L.J. 1093 (1977); Mullaney, *Theories of Measuring Damages in Security Cases and the Effects of Damages on Liability,* 46 Ford.L.Rev. 277 (1977); Reder, *Measuring Buyers' Damages in 10b–5 Cases,* 31 Bus. Law. 1839 (1976).

55. Doc. No. 1, Ex. L.

56. Doc. No. 1, Ex. D.

57. At the time of settlement, McLean also surrendered all assets of Technidyne which included, *inter alia,* patents, copyrights and engineer-

ing notebooks which were valued for settlement purposes at $5,000.

58. Doc. No. 178R at 33–36. The testimony of plaintiff's expert witness was unrebutted by defendant's expert. Doc. No. 178Q at 98–99. Their testimony also conclusively established that the liquidation value of Technidyne was less than its liabilities. Thus, the transaction between shareholders and McLean at the time of settlement whereby they surrendered $1.3 million in notes in exchange for $70,000 cash and all documents of the company valued for settlement purposes at $5,000 does not negative the conclusion that the business had no market value.

took the risk of additional loss when he continued to invest money in its operation and consequently an award of damages operates to insure his losses. In so arguing, defendant ignores the fact that every buyer can be expected to promote his business by the infusion of operating funds. That McLean would so invest was unquestionably foreseeable. The question is whether the amounts spent and the duration of spending were reasonably related to the fraudulent conduct of the defendants.

At the closing, McLean advanced $100,-000 to satisfy pre-existing Technidyne debts. This loss must be considered a direct consequence of purchasing Technidyne even though he was not obliged to discharge these debts and reference was not made to them in the sales contract. After the acquisition, McLean through his staff ordered that all activity be directed toward increasing sales. To that end, the sales force was increased and attention was turned to marketing a less complicated, theoretically more competitive model, the Model 560. Jeter began exploring the possibility of a manufacturing plant in Puerto Rico, a location with tax advantages. Meanwhile, Walsh was instructed to prepare an ambitious research and development plan. Clearly the mood was one of optimism at Technidyne until early warning signals proved irreversibly correct and the plaintiff unequivocally knew that he had purchased a business fatality. These developments took place over several months.

By late March Jeter became concerned about the collectibility of the accounts receivable.[59] At about this time, the newly installed President of Technidyne, Champ Meyercord ("Meyercord"), visited Amvit and Southern Laser, a dealer to whom sales were allegedly made, and discovered their dealings with Technidyne were not as had been represented. McLean then was alerted to possible difficulties with respect to the two areas which he had considered material at the time he agreed to buy Technidyne, namely the former Amvit relationship and the receivables. In mid-April Jeter confronted Friel with his and McLean's growing uneasiness about the accuracy of representations concerning Technidyne. Friel rebuffed any suggestion that the receivables were faulty, told Jeter he was overreacting and instructed him to check for hard facts.[60]

Despite repeated attempts to collect the so-called receivables including delinquency letters sent as late as June 9, 1970,[61] no money was forthcoming. Soon thereafter in late June or July, McLean had amassed sufficient incontrovertible facts to conclude that Technidyne was devoid of sales, and that in January 1970, instead of buying a viable company, he had purchased the mere carcass of a business. Convinced he had been defrauded, he instructed his counsel to meet with the Technidyne principals to effectuate a rescission.[62] Failing that, plaintiff sought to take legal action and finally in September 1970, commenced this lawsuit. Plaintiff's date of July 1970 as the time that he actually learned of the fraud contrasts with that of the defendant who advances a considerably earlier date and would limit the damages to $32,056 expended by mid-March. The weight of evidence supports the plaintiff's view that the fraud and its ramifications were not completely and totally exposed to the requisite degree of certainty until late June or July 1970 and consequently the later date is deemed controlling.

Defendant Schiavi also argues that McLean is barred from recovering damages incurred after the date he learned of the fraud. Relying on the duty of the plaintiff to mitigate damages, defendant cites cases which generally deal with minority shareholders who are in a position to sell their stock without disastrous consequences to

---

59. He was aware that payments were in arrears and the "sold" equipment still in Technidyne's custody. Doc.No. 157; Doc.No. 178D at 69.

60. *Id.* 80–85.

61. Alex. Ex. E(5a); Alex. Ex. F(1a).

62. Doc. No. 178A at 118.

the business.[63] McLean as the controlling force of a non-viable business was not such a person. To have ceased operations when he first learned of the bogus sales and the true nature of the Amvit relationship may well have been imprudent. Although defendant has argued that McLean may not recover for monies expended after March, 1970, he has also maintained that McLean abandoned the market to others when he closed the business too hastily without analyzing the competition nor awaiting the results of a broad-based advertising campaign. Defendant cannot have it both ways—that McLean waited too long to close up or in the alternative, that he closed too soon when he terminated the business in October 1970.

Between January 28, 1970, the date of sale, and October 1970 when McLean shut down Technidyne, $464,751[64] had been actually lost in the business. As initial review of Technidyne's balance sheets and income statements reveal somewhat more than that amount.[65] However, paper losses taken in May and July reflecting a re-evaluation and "write-down" of inventory are disregarded.[66] Because McLean's out-of-pocket losses were previously calculated at the full purchase price, he has already been compensated for the full amount of the inventory and cannot collect twice. The $464,751 amount spent between January and October 1970 does not appear unreasonable. After an early infusion of funds, decreasing amounts were expended until the close of business in October. There is no evidence that the business was conducted other than responsibly. From all that is evident, there was no attempt to foreclose creditors or to throw the business into bankruptcy. Nor should a businessman who values his reputation have to resort to such measures in order to confer a benefit upon those who defrauded him.

A review of the evidence results in the conclusion that the $464,751 lost during the nine months of McLean's ownership and operation was a not unreasonable amount and in addition was an amount that defendants could reasonably have foreseen that McLean would invest. Therefore, the amount of $464,751 will be added to the $100,000 expended immediately after the closing and a total of $564,751 will be awarded as consequential damages.

## RESALE

There is one last issue to be considered in computing damages, notably McLean's resale of Technidyne's stock to his staff members. On March 16, 1970 after some negotiation, a sales agreement was executed by which McLean sold Jeter, Bendetto (another McLean associate) and Meyercord a 21% interest in Technidyne for $545,000. When the emaciated infrastructure of Technidyne became convincingly apparent in late June or July 1970, McLean agreed to rescind this sale on the grounds of mutual mistake.[67] Subsequently McLean refunded the $545,000 and the stock was returned to him.

Defendant, arguing that McLean's damages must be reduced by $545,000, alleges that vestiges of the fraud were apparent at the time of the sale but that the buyers knowingly proceeded with the transaction. In support of his argument, defendant points to the March 23 and April 6, 1970 minutes of the corporation[68] which reflect a reduction in the agreed upon price of the transferred stock based upon a devaluation

---

63. *Harris v. American Investment Co.,* 523 F.2d 220 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Richardson v. MacArthur,* 451 F.2d 35 (10th Cir. 1971).

64. The total net losses were as follows: From January 28 to March 16, $32,056; between March 16 and April 30, $124,600; May, $62,409; June, $56,797; July, $70,358; August, $49,935; September, $42,022; and October, $26,574. These figures were calculated by the Court based on Alex. Ex. X.

65. *Id.*

66. Thus, the amounts of $9,118 and $37,946 have been subtracted from totals provided by plaintiff in Alex. Ex. X.

67. Alex. Ex. V1; Alex. Ex. V2.

68. Alex Ex. 57; Alex. Ex. U.

of the worth of the company from $2,054,-000 to $1,899,360 to $1,769,330. From these facts, defendant urges that Jeter, Bendetto and Meyercord bought and McLean sold with knowledge of the bogus nature of the receivables and consequently any rescission based on mutual mistake is ill-founded.

█ The difficulty with defendant's position is that it assumes that Jeter and Bendetto, two long term staff people of McLean, and Meyercord, a new McLean associate, would be willing to be obligated for worthless stock and that McLean would obligate them, knowing he had sold them a worthless investment. Given the nature of the association, it is far more probable that plaintiff and his business associates did not appreciate, at the time of the resale, the orchestrated fraud practiced upon McLean. Having determined that the fraud perpetrated upon McLean by the principal shareholders was not established to McLean's satisfaction until late June or July 1970, the Court concludes that at the time McLean sold a partial interest in Technidyne on March 16, 1970, neither he nor the buyers were in a position to know the shares were worthless. Accordingly, rescission is legally sound under principles of contract law in that the fraud perpetrated on McLean gave rise to a mutual mistake.

Defendant also notes that McLean's voluntary rescission of the stock sale to staff was done expressly for purposes of advancing this litigation [69] and should not redound to defendant's detriment. As between the innocent buyers who would suffer the loss were the contract between McLean and them not rescinded and the defendants who precipitated the wrong in the first place, there is no question as to the proper course of action. Encouraging a seller who inadvertently sells a white elephant to set the wrong right is concomitant with the ends of justice. Therefore, McLean's damages will not be reduced by the amount of the sale.

## APPORTIONMENT OF DAMAGES

In apportioning damages, the guiding principle is that plaintiff is entitled to be made whole but that he may not recover more than his loss. In that regard, it is important to establish what amount is to be apportioned among the wrongdoers. Actual damages have been calculated at $1,950,-000, the amount expended in purchasing Technidyne to which is added $564,751 in consequential damages. This total of $2,514,751 must be reduced by the amount received in settlement in order to determine the amount to be apportioned.

█ Shields contributed $45,000 at the time of settlement and that amount must be subtracted from the total damages. The shareholders as a group cancelled notes valued at $1,300,001.85 in exchange for $70,000 in cash and $5,000 "in kind." [70] To reduce the shareholders' settlement from the damages and then divide the remainder among the culpable defendants would be improper because the settling culpable shareholders would be paying twice. *Herzfeld v. Laventhol*, 540 F.2d 27, 38–39 (2d Cir. 1976). However, reduction of the damages by the amount paid by the innocent shareholders in settlement in no way creates prejudice. The innocent shareholders surrendered notes obliging McLean in the amount of $478,692.27 [71] and this amount may also be subtracted. As to the $75,000 value surrendered by McLean in exchange for the outstanding notes, plaintiff has submitted no evidence to suggest which of the shareholders collected it. Therefore, it cannot be assumed that the innocent shareholders received it. To do so would have the effect of

---

**69.** McLean's letter of December 24, 1970 to the buyers confirming their agreement of July 16, 1970 to rescind expressly acknowledges this litigation as one reason for the buyers to return their stock to him. Alex. Ex. V1.

**70.** "In kind" refers to such items as the patents, copyrights, engineering note books and the like. Doc. No. 173, Ex. C.

**71.** Helen Friel Trustee, $72,897.30; Lang $315,-888.30; Francis $24,299.10; Hessler $48,-598.20; Apostolico $9,719.64; Aiken $4,859.82; Baker $2,429.91. Doc. No. 159, Ex. A.

reducing the amount of their settlement and increasing the amount to be apportioned. Instead, since the burden to prove damages rests with plaintiff, it must be assumed that the active shareholders received both the $70,000 in cash and the documents valued at $5,000.

Thus, in order to determine the amount to be apportioned, the settlement amounts of $45,000 and $478,692.27 are subtracted from the total damages of $2,514,751 leaving an amount of $1,991,058.73. Ultimately, of course, the amount paid by the culpable shareholders will be given effect because in any event plaintiff is entitled only to the unpaid balance.[72]

Other critical variables in any division of damages are the number of liable parties and the share of the loss each must absorb. For ease of administration, the majority of reported cases have simply divided the amount of damages by the number of responsible entities. *See, e. g., Herzfeld v. Laventhol,* 540 F.2d at 38.

Plaintiff has argued at length that damages be apportioned between the selling shareholders considered as one entity and Schiavi as a second entity. Plaintiff points out that the culpable shareholders played a common role and but for their collective efforts in promoting Technidyne, McLean would not have purchased the company. In support of their position, plaintiff cites *Wassel v. Eglowsky,* 399 F.Supp. 1330 (D.Md.1975), *affd.,* 542 F.2d 1235 (4th Cir. 1976), and *Lutz v. Boas,* 40 Del.Ch. 130, 176 A.2d 853 (Del.Ch.1961), demonstrating that the entity theory has been well received in both federal and state court.

Not surprisingly, defendant has urged that the damages be apportioned among the number of culpable parties, namely the four individual shareholders and Schiavi. In response, plaintiff has argued that the "fact that the former Technidyne shareholders are independently liable to plaintiff does not mean that for apportionment purposes the Court cannot view them as a single entity."[73] The Court agrees that application of the entity theory is highly appropriate under the facts of this case. However, this conclusion does not fully resolve the question of how to apportion damages. In this case there was a vast difference between defendants in the degrees of their wrongdoing and the damages ought to reflect that fact. Accordingly, the Court, computing damages under the "entity" and "head count" theories, concludes that equity demands consideration of the relative degrees of fault painfully evident in this case.

If, as plaintiff urges, all the shareholders are considered as one entity, and Schiavi is one entity, each would be liable for fifty percent of the damages. Noting that the shareholders collectively agreed at settlement to cancel $1,300,001.85 in notes in exchange for $75,000, plaintiff maintains the active shareholders have essentially met their responsibility and it falls to Schiavi to pay the balance of $1,244,749.15 required to make plaintiff whole. There are several problems with this oversimplified approach, not the least of which is grouping the innocent shareholders with the active shareholders as one entity with the result that the culpable shareholders become beneficiaries of the amount paid by the inactive shareholders.

More logical would be treatment of the culpable defendants as one entity independent from the innocent shareholders. Considering the active shareholders as one entity, it is well to remember that they collectively received and retained a down payment of $252,709.08.[74] In addition some of

---

72. The exchange of $75,000 for $1,300,001.85 in notes reduces the shareholders' settlement to $1,225,001.85. Shields paid $45,000. Subtracting these amounts from $2,514,751 results in a balance of $1,244,749.15.

73. Doc. No. 214 at 71.

74. Alexander $97,195.80; Walsh $74,766; Jones $5,981.28; Friel $14,953.20 and $59,-812.80 paid to Hessler in trust for Friel. Doc. No. 159, Pre-trial Order Ex. A. This trust is included in the calculations of the culpable shareholders whereas 30 additional shares, held in trust for the Friel children by Helen Friel, are included among the innocent shareholders.

them were released on a $250,000 debt. There is no evidence to suggest that the active shareholders did not also retain the $75,000 exchanged between McLean and the shareholders at settlement. Thus, the amounts received as down payment, as satisfaction of a debt and in settlement total well over some $575,000. Secondly, although they claim they gave up in settlement the amount of $1,300,001.85, these active shareholders actually forgave notes totaling $821,309.58.[75] Having gained at least $575,000 through the fraudulent transaction, and having surrendered $821,309.58 in notes, these defendants can be said to have contributed only some $246,309. That the culpable shareholders who played a far more active role than Schiavi in perpetrating the fraud have contributed a far less share toward making plaintiff whole than would Schiavi is apparent from the following analysis.

The total amount to be apportioned among the culpable parties is $1,991,058.73. Considering the active shareholders and Schiavi as two separate entities, each should theoretically pay $995,529.37. However, the amount required to actually make McLean whole is the unpaid balance of $1,244,749.15. A joint and several tortfeasor obliged to discharge this remaining amount, such as Schiavi, could seek contribution from the settling defendants only for the amount he paid in excess of $995,529.37, his pro rata share. This result is characterized by more mathematical than judicial integrity and is rejected as inequitable in this case where the involvement of the active shareholders far exceeded that of Schiavi whom they actively misled.

Defendant Schiavi has urged that a more equitable division of damages be based upon consideration of the four active shareholders and Schiavi as five entities with each bearing 20% of the loss. Apart from the problem of perceiving the selling defendants independently of each other, this method has the undesirable effect of equating the liability of Friel, for example, with that of the accountant. In addition, it must be remembered that three of the four shareholders were indemnified and Jones was not; from this arrangement serious consequences flow for the defendant Schiavi who must absorb Jones' share until, if ever, he is reimbursed. Because the Court ultimately rejects this form of calculation,[76] it is unnecessary to reach defend-

---

**75.** Alexander $315,888.30; Walsh $242,991; Jones $19,439.28; Friel $48,598.20 plus $194,392.80 held by Hessler as trustee. Doc. No. 159, Ex. A.

**76.** Utilizing defendant's "head count" approach results in two possible results depending on whether the amounts the shareholders received as down payments are included in the computations. $1,991,058.73 is the amount to be divided among the five wrongdoers which results in $398,211.75 per defendant. At settlement Friel forgave notes payable to him or his trust in the amount of $242,991. Given that the pro rata share under the "head count" theory is $398,211.75, Friel settled for $155,220.75 less than his pro rata share. Walsh likewise forgave a note valued at $242,991. As his pro rata share under the head count is also $398,211.75, he too has a deficiency of $155,220.75. At settlement Alexander cancelled a note due him for $315,888.30 or about $82,323.45 less than the $398,211.75 he owes under the head count theory. The total of these unpaid amounts is $392,764.95.

The effect of this deficiency on Schiavi is as follows: Schiavi as the non-settling joint and several tortfeasor would be obliged to dis-

charge the balance of $1,244,749.15 even though Schiavi's pro rata share under the head count theory is only $398,211.75. Because Friel, Walsh and Alexander were indemnified by McLean against any additional claims arising out of this lawsuit, Schiavi rather than proceeding directly against these individuals for contribution may reduce the balance by the deficiencies owed by them. Therefore, Schiavi would reduce the balance of $1,244,749.15 by the deficiency of $392,764.95 to which is added the $75,000 received from McLean and actually pay $776,984.20. Jones was not indemnified so although he surrendered a note of $19,439.28 which is $378,772.47 less than his pro rata share, Schiavi would have to collect directly from Jones.

The foregoing calculations consider only the notes given up in settlement and disregard the amounts retained by the culpable shareholders as down payments. Principles of unjust enrichment may require reducing the amounts each active shareholder discharged in settlement by the amount he retained as a down payment.

Friel received $74,766 from McLean as a down payment on his stock. The balance of $242,991 was discharged at settlement. Sub-

ant's argument pursuant to section 20(a) of the Securities Act of 1934, that the control group, Alexander, Friel and Walsh are responsible for Jones' share under principles of respondeat superior.

 An additional method of computation particularly appropriate to the facts of this case involves consideration of the relative fault of the parties. Under this theory, the non-settling defendant as a joint and several wrongdoer is obliged to make plaintiff whole but can obtain contribution from the settling defendants in an amount proportionate to their fault. Although utilization of this approach has not been directly employed in any federal securities case to date, it has been frequently advanced in the literature as the modern approach.[77] As one well known commentator has stated, "[g]iven the possible complexities of securities violations, their intricate ramifications,

and the suability under 10b–5 of relatively remote and insignificant parties, there will be occasions when it is just and reasonable to apportion liability of lesser wrongdoers."[78] After careful consideration, it is concluded this is one such case that ought to be decided under the doctrine of relative culpability.

In contrast to the federal right for contribution, there is ample guidance with respect to the state claim. Defendant's cross-claim for contribution based on the finding of common law fraud must be resolved on the basis of the Delaware statute which permits apportionment by comparative fault.[79] Delaware was one of the first states to adopt the 1939 Uniform Joint Tortfeasors Act providing that:

> "When there is such a disproportion of fault among joint tort-feasors as to ren-

---

tracting the down payment from the settlement amount equals $168,225. Because his pro rata share utilizing the head count theory is $398,211.75, Friel therefore settled for $229,986.75 less than the amount he actually owed.

Walsh sold a hundred shares of Technidyne stock to McLean. In receipt of $74,766 down payment, he forgave the balance of $242,991 at settlement. Consequently, Walsh's net outlay is the difference in these amounts which is $168,225 or $229,986.75 less than his share of $398,211.75. Alexander sold 130 shares of Technidyne to McLean for which he received a down payment of $97,195.80 and a note for $315,888.30. He forgave the note when he settled with McLean. Reducing the down payment from the amount of the note results in the sum of $218,692.50. Since under the head count theory, he owed $398,211.75, Alexander has a deficiency of $179,519.25.

The combined deficit, which the foregoing individuals should have paid but did not, is $639,492.75. Therefore, Schiavi may reduce the balance of $1,244,749.15 by $75,000 and the deficit of $639,492.75 which results in a sum of $530,256.40. This is the amount Schiavi would pay under the head count theory if effect is given to down payments.

Because Jones was not indemnified, Schiavi could not reduce the balance by the amount owed by Jones but rather would attempt to collect directly from Jones. Jones received $5,981.28 as down payment and surrendered a note valued at $19,439.28. Consequently, he has provided $13,458 of his $398,211.75 share. However, the maximum amount Schiavi could collect from Jones if Schiavi paid $530,256.40 would be the difference between that amount

and the $398,211.75 calculated to be Schiavi's pro rata share.

77. A number of writers have argued that there is little reason to limit the doctrine of comparative fault to the area of negligence and have suggested that the multiple defendants common in securities litigation render it an appropriate context for its application. Meanwhile, a growing number of jurisdictions have substituted comparative fault for the harsher rule of contributory negligence demonstrating that use of comparative fault provides a workable and flexible tool for the apportionment of damages. *See* L. Loss, ALI, Fed. Sec. Code 1418(f)(2) (Draft No. 2, 1973); Freund & Hacker, *Cutting Up the Humble Pie: A Practical Approach to Apportioning Litigation Risks Among Underwriters,* 48 St. John's U.L.Rev. 461, 472 (1974). Note, *The Role of Contribution in Determining Underwriters' Liability Under Section 11 of the Securities Act of 1933.* 63 U.Va.L.Rev. 79, 98–100 (1977); Note, *Contribution Under Federal Securities Laws,* 1975 Wash.U.L.Q. 1256, 1308.

78. Bromberg, Securities Law: Fraud, Vol. 3; 8.5 (585) at 208.52.

79. There is no question that defendants share a common liability arising out of a single injury and thus as joint and several tortfeasors are proper subjects of a state claim to contribution. *Hood v. McConemy,* 53 F.R.D. 435 (D.Del. 1971). Among the cases decided in Delaware with regard to relative fault are *Fehlhaber v. Indian Trails, Inc.,* 45 F.R.D. 285 (D.Del.1968), aff'd, 425 F.2d 715 (3d Cir. 1970); *ICI America, Inc. v. Martin-Marietta Corp.,* 368 F.Supp. 1148 (D.Del.1974).

der inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tort-feasors shall be considered in determining their pro rata shares." 10 *Del.C.* § 6302(d).

▮ Although plaintiff argues that the statute is limited to cases of negligence, there is no limitation expressed within the terms of the statute. Rather there is evidence that no such qualification was intended. Instructive are comments to the 1955 version of the Uniform Joint Tortfeasors Act noting that Delaware by adoption of the 1939 Act applies the principle of relative culpability to non-intentional and intentional torts.[80] Commentators writing at the time of its passage understood the statute to apply to intentional wrongdoing as well as non-intentional torts agreeing that principles of apportionment were inherently more fair in either case and therefore basic to a well-ordered system of loss allocation. Gregory, *Contribution Among Tortfeasors: A Uniform Practice,* 1938 Wisc.L.Rev. 365, 380.

The plaintiff maintains that the degrees of fault characterizing negligent conduct are absent in intentional behavior. Not only do the facts of this case directly point to a contrary conclusion but also this court has acknowledged the existence of "a wide spectrum of prohibited behavior between negligence and specific intent to defraud." *McLean v. Alexander, supra,* 420 F.Supp. at 1078. Finally, plaintiff asserts that the apportionment of damages which results in a reduction of damages for some defendants will undermine the principal of deterrence. This is the same argument found to be unpersuasive by the overwhelming majority of states which now permit contribution. Although one defendant's damages are reduced, another's are increased; thus a system which holds all wrongdoers liable for some damages, the amount of which depends on the extent of his involvement, will in all likelihood increase deterrence. Under such a system, one cannot embark on an unlawful course with the hope or expectation that someone less culpable will foot the bill. Thus vigilance, if affected at all, is more likely increased than decreased.

In that the concept of contribution is of relatively recent vintage, it is not too surprising that equitable methods of achieving contribution are only now evolving in the context of federal securities cases. Apart from those situations where the less culpable wrongdoer has unsuccessfully sought full indemnification from the more culpable, *see Globus I, supra; Odette, supra,* there has been limited opportunity for courts to consider relative culpability with regard to cross-claims for contribution in securities cases. The court in *Gould v. American Hawaiian Steamship Co., supra,* identified relative fault as one equitable method of apportioning damages among wrongdoers but declined to apply it.[81] Another court without discussing the theory of relative fault departed from traditional pro rata contribution and ordered the less culpable parties to pay significantly lesser amounts.[82] *Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544 (E.D.N. Y.1971).

Other authorities have widely embraced the concept of relative fault in the area of securities law arguing that fundamental fairness dictates a departure from the sim-

---

**80.** 12 ULA Uniform Contribution Among Tortfeasors Act (Commissioners' Comment at 87).

**81.** The *Gould* court also reviewed the argument that contribution should be based on the amount of benefits received. In the instant case, defendant Schiavi has also urged use of the "benefits received" theory. Pointing out that he received only $3,000 for his work while the individually liable shareholders netted over $575,000, he has argued that damages be apportioned accordingly.

The "benefits received" theory emerged from the language of section 11(f) of the 1933 Securities Act which provides for contribution "as in cases of contract." However, the language is more likely intended as a departure from the traditional no contribution rule of tort law than to express a measure of damages appropriate to contribution claims. *Gould,* 387 F.Supp. at 170–71.

**82.** The issuer company paid more than $300,-000 whereas each of the three individual defendants paid $5,000.

ple pro rata division among parties. Professor Loss in the proposed code governing federal securities, endorses relative culpability as a basis upon which to assess damages, as do other commentators.[83] These commentators argue that the pro rata rule leads to arbitrary and irrational results whereas comparative fault more directly stimulates deterrence, is only minimally more difficult to administer [84] and most importantly best serves justice. Note, *The Role of Contribution in Determining Underwriters Liability Under Section 11 of the Securities Act of 1933,* 63 U.Va.L.Rev. 79, 96–100 (1977).

In accordance with this trend, recognizing the wisdom of an equitable distribution of the loss, is the recent decision of the Supreme Court which replaced the traditional rule of equal allocation of damages in admiralty cases with a rule of damages based upon proportionate fault. *U. S. v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). It is unclear why a different result ought to obtain in the area of federal securities or why in the absence of controlling federal precedent, a result different from that provided by state law is mandated. Under Delaware law, defendant has the right to be informed of the percentage of damage which he is deemed to have caused. Upon satisfying the entire judgment required to make plaintiff whole, defendant has a right to cross-claims for contribution against his co-defendants, for the amount he has paid plaintiff in excess of his share, calculated on the basis of fault. Considerations of equity and common sense counsel that this preferred result ought to obtain under the federal claim as well.

In the case sub judice, there were two major areas of misrepresentation: the relationship with Amvit and current sales activity. Alexander, Friel and Walsh are found to have deliberately misrepresented both; Jones, only the current sales, and Schiavi, the accounts receivable whose confirmation supported the notion that there were current sales. There is no question that Alexander, Friel and Walsh had first-hand knowledge of Amvit and that Jones was the source of the false sales report. Moreover, these selling shareholders personally created the web of deceit which ensnared both McLean and Schiavi. Thus, the facts of this case support the position of plaintiff that the shareholders by virtue of their common purpose and unified position be considered one entity [85] and that Schiavi be treated as one entity for purposes of apportioning damages under both federal and state law.

Applying principles of relative fault to the instant case, the Court concludes that Schiavi, by issuance of a recklessly prepared audit which misstated the existence of receivables and consequently gave substance to the fiction of current sales of Technidyne, is responsible for 10% of McLean's loss. The remaining 90% of McLean's damages are laid at the feet of the culpable shareholders who in face to face meetings and through reports, actively misrepresented the assets of the company and knowingly deceived McLean as to the facts surrounding both Amvit and the current sales. As a consequence of their actions, they must bear a greater responsibility for the resultant losses. McLean, however, has indemnified them for future losses. Consequently, they need pay no more directly to him. Furthermore, Schiavi is

**83.** L. Loss, ALI, Fed. Sec. Code 1418(f) (Draft No. 2, 1973). Freund & Hacker, *supra,* 48 St. John's U.L.Rev. 461, 472 (1974). Note, *supra,* 1975 Wash.U.L.Q. 1256 at 1312.

**84.** For ease of administration, one might consider these several factors for consideration when apportioning damages: the defendant's extent of involvement, duration of involvement, knowledge of entire scheme to defraud, intent, extent of his contribution toward causation of

the losses and benefit received. Bromberg, Securities Law: Fraud, Vol. 3; 8.5 (585) at 208.52.

**85.** As these individuals operating together created one entity, it is not feasible to consider Jones as other than indemnified. Had Jones been represented by counsel at the time of the dismissal against him, quite likely he would have been expressly indemnified as were all other settling defendants.

permitted to reduce the judgment against him by the amount owed by the selling shareholders.

The judgment against Schiavi as a joint and several tortfeasor is the unpaid balance of $1,244,749.15. However, of the $1,991,058.73 in damages to be apportioned among the wrongdoers, 90% or $1,791,952.86 should have been paid by the active shareholders and 10% or $199,105.87 by Schiavi. Reducing the balance by what the shareholders should have paid results in $199,105.87.[86] Consequently, Schiavi will be ordered to pay damages in the amount of $199,105.87.

### Pre-Judgment Interest

Pre-judgment interest is not to be accorded as a matter of course but only "in response to considerations of fairness." *Thomas v. Duralite Co.*, 524 F.2d 577 (3d Cir. 1975), quoting *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). *See also Maryland Casualty Co. v. Hanby*, 301 A.2d 286 (Del.1973). The defendant did not unduly prolong this litigation and the plaintiff has not asserted that his investment opportunities were in any way hampered by not having the use of this money. The individual shareholders did not pay interest under terms of their settlement nor were the original promissory notes interest bearing. Given those facts and the peripheral role played by Schiavi, the Court in its discretion concludes that it would be inequitable to award pre-judgment interest in this case.

Accordingly, the foregoing constituting Findings of Fact and Conclusions of Law pursuant to F.R.Civ.P. 52, the accountant Schiavi is obliged to pay plaintiff the amount of $199,105.87.

Submit order on notice within 20 days.

---

**86.** The amount paid by the active shareholders without consideration of down payments they received equals $821,309.58. In the absence of evidence to the contrary, they are assumed to have received $75,000 from McLean reducing their amount in settlement to $746,309.58 or $1,045,643.62 less than should have been paid. Subtracting this amount from the unpaid balance of $1,244,749.15 results in $199,105.87.